128 P.3d 104 (2006)
STATE OF WASHINGTON, Respondent,
v.
Daniel John HOCHHALTER, Appellant.
No. 32117-3-II.
Court of Appeals of Washington, Division Two.
February 2, 2006.
*105 James David Senescu, Clark County Prosecutors Office, Vancouver, WA, for Respondent.
Lisa Elizabeth Tabbut, Attorney at Law, Longview, WA, for Appellant.
MORGAN, J.P.T.[1]
¶ 1 Daniel John Hochhalter appeals convictions for felonious violation of a domestic violence order (Count I), second degree assault (Count II), and second degree unlawful *106 possession of a firearm (Count III). He alleges that the evidence is insufficient to support Count I, that the "to convict" instruction on Count III erroneously omitted an element of the crime, and that he was denied his right to have a jury find each fact needed to support his sentence. We reverse the conviction on Count I and vacate the sentences on Counts II and III.
¶ 2 In early 2004, Hochhalter was D.D.'s ex-boyfriend. On January 29, 2003, February 11, 2004, and again on March 12, 2004, D.D. obtained domestic violence orders in which the court prohibited him from contacting her.
¶ 3 In March 2004, D.D. was living in a motor home. On the night of March 28, 2004, she parked it in a park-and-ride near I-5 and 134th Street in Vancouver. She and her current boyfriend, David Hubbard, then went to sleep inside. A friend of theirs, Ivana Johnson, went to sleep in the back seat of her own car, which was parked next to the motor home.
¶ 4 "[A]t approximately 5 A.M. or in the early morning hours"[2] on March 29, 2004, Johnson awoke and saw Hochhalter at the wheel of the motor home. When he saw her looking at him, he yelled and fired a pistol "in [her] direction."[3] He then jumped out of the motor home and fled across the parking lot.
¶ 5 Hubbard heard the shot. He responded by diving naked out a window on the motor home's far side, running around it, and jumping into Johnson's car. Moments later, D.D. emerged from the motor home, "jumped in the front seat" of Johnson's car, and the three of them "took off."[4]
¶ 6 Johnson drove to a nearby Safeway. She "was gonna call 9-1-1,"[5] but Hubbard insisted that she first take him to a friend's house; he had outstanding warrants and did not want to be in contact with the police. Acceding to his request, Johnson and D.D. drove him to the friend's house, which was a "good ten minutes" away.[6] After dropping him off, they returned to the same Safeway and "got something to drink."[7] They finally called 911, Johnson later said, either "twenty-five" or "forty-five minutes" after the incident.[8]
¶ 7 At 6:51 A.M., Deputy Skordahl was dispatched to the Safeway, where he spoke to Johnson and D.D. through the passenger window of Johnson's car. He later opined that Johnson and D.D. "were very excited, and they both really couldn't stop talking at the same time."[9] They purported to relate what had happenedwhile purposefully omitting any mention of Hubbard.
¶ 8 About 8 A.M., Deputy Buckner interviewed D.D. at a fast food restaurant near the Safeway. D.D. now said that a man had been with her inside the motor home and that he had left through a window after hearing gunfire. She falsely identified the man as "David Reap."[10]
¶ 9 Hochhalter was arrested at 6:30 P.M. that same night. He "denied any knowledge of the incident, said he was not there, and didn't know why he was being accused of it."[11] He claimed that his car was with a mechanic waiting to be fixed, but officers located it later that night, parked not far from the park-and-ride.
¶ 10 The State charged Hochhalter with feloniously violating a no-contact order (Count I), assaulting Johnson in the second degree (Count II), and unlawfully possessing a firearm in the second degree (Count III). Count I alleged that Hochhalter violated a *107 no-contact order "by having contact with and intentionally assaulting [D.D.]."[12]
¶ 11 At the ensuing jury trial, the State called Johnson, Hubbard, Skordahl and two other deputies, who testified essentially as set forth above. The defense called a ballistics expert to cast doubt on the origin of a hole the officers had observed in the motor home's windshield, and an alibi witness whose testimony the jury later rejected. The State did not call D.D., and the defense did not call Hochhalter.
¶ 12 During Skordahl's testimony, the State asked him to relate the statements that D.D. and Johnson had made while speaking to him in the parking lot of the Safeway. The defense objected on both hearsay and confrontation grounds. The trial court overruled, and Skordahl then testified to what D.D. and Johnson had told him. D.D. said:
[S]he was sleeping in her motor home, and the purpose for sleeping in the motor home and the Park & Ride, which is somewhat of an unusual occurrence, was to get away from Mr. Hochhalter....
She said that she was essentially traveling with Ivana, and that Ivana was sleeping in her car next to the motor home.
... [S]he was awoken this morning with Mr. Hochhalter in the motor home, that he had attempted to drive her away in the motor home, and that when she had awoken he was brandishing a what she describes as a revolver firearm.....
She said that she had a small rock collection in the back of the vehicle with her and that she had thrown rocks at Mr. Hochhalter. She believed that she'd struck him on the head. ...
She said that Mr. Hochhalter had, as I indicated, brandished the firearm and what she believed was fired two shots from the revolver.
She wasn't exactly sure ... where the rounds had gone, but that he had fired two shots, anyway, and that he had threatened verbally to kill her, kill himself, that he had pointed the firearm at her and at himself as well.
She said ... that Mr. Hochhalter then exited the motor home and that was the last she had seen him.[13]
Johnson related what she had observed, already described above, from her vantage point outside the motor home. Neither D.D. nor Johnson mentioned that Hubbard had been present or that they had driven him to a friend's house before calling 911.
¶ 13 At the end of the evidence, the trial court instructed the jury on what it had to find in order to convict on Count III, unlawful possession of a firearm. The court said in Instruction 18 that "[a] person commits the crime of unlawful possession of a firearm in the second degree when he has a firearm in his or her possession or control and he has previously been convicted of a felony."[14] In Instruction 19, the court said:
To convict the defendant of the crime of unlawful possession of a firearm in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about March 29, 2004, the defendant had a firearm in his possession or control;
(2) That the defendant had previously been convicted of a felony; and
(3) That the possession or control of the firearm occurred in Clark County, State of Washington.[15]
The court did not require the jury to address the defendant's knowledge, but no one objected.
¶ 14 The jury convicted Hochhalter on all three counts. It was not asked to find, and thus it did not find, whether Hochhalter was on community placement on March 29, 2004.
¶ 15 On July 14, 2004, the trial court convened a sentencing hearing. Although the jury had not found that Hochhalter was on community placement on March 29, 2004, the State asked the court to find that fact and *108 add one point to the offender score.[16] Although defense counsel responded, "I don't disagree," nothing in the record shows that Hochhalter knew of or intentionally relinquished his right, if any, to have a jury decide that fact. The trial court granted the State's request, thereby increasing the top of the "standard range" on Count I from 54 months to 60 months, the top of the "standard range" on Count II from 43 months to 57 months, and the top of the "standard range" on Count III from 29 months to 43 months. Utilizing these increases, the trial court then imposed concurrent sentences of 60 months on Count I, 57 months on Count II, and 43 months on Count III.

I.
¶ 16 On appeal, Hochhalter argues that the evidence is insufficient to support Count I. He reasons that D.D.'s statements to Skordahl "were improperly admitted as excited utterances,"[17] and that without them, the evidence is insufficient to support a finding that he assaulted D.D. We begin by examining his assertion that D.D.'s statements to Skordahl "were improperly admitted as excited utterances."
¶ 17 Although ER 801(c) generally excludes out-of-court statements offered to prove the truth of the matter asserted,[18] ER 803(a)(2) excepts "[a] statement relating to a startling event or condition made while ... under the stress of excitement caused by the event or condition." According to the advisory committee that promulgated Federal Rule of Evidence 803(2), from which Washington's ER 803(a)(2) was copied, the underlying theory "is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication."[19] Hence, "the `key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.'"[20]
¶ 18 In State v. Brown,[21] the Washington Supreme Court addressed these principles. T.G. was in her apartment with her boyfriend when Brown came to her door and asked her to perform an act of prostitution. She voluntarily accompanied him to his apartment where, according to her later testimony, she was raped by him and three other men. She escaped out a window, returned to her own apartment, and discussed the matter with her boyfriend. He initially suggested that she call the police, but she doubted that the police would believe her. He then "suggested that she think of something."[22] An undetermined amount of time later, she called 911 to report that she had been raped, and she "was crying hysterically during the course of the call."[23] Brown was charged with rape, *109 and the case proceeded to a jury trial. T.G. testified that "she had the opportunity to, and did in fact, decide to fabricate a portion of her story prior to making the 911 call."[24] The trial court admitted her statements to 911 as excited utterances, but the Washington Supreme Court reversed. The Supreme Court held that T.G.'s statements to 911 could not have been excited utterances because her own testimony demonstrated that she had reflected on and fabricated at least a portion of what she had said to 911.[25]
¶ 19 The State argues that we should distinguish Brown because T.G.'s fabrication "related to the actual corpus of the crime itself," while D.D.'s "fabrication related solely to the presence of a third person."[26] In our view, however, Brown applies whenever the undisputed evidence shows, or the trial court finds pursuant to ER 104(a), that the declarant consciously reflected on what he or she said before he or she said it.[27]
¶ 20 In this case, according to Johnson, she and D.D. delayed calling 911 for an undetermined period of time. During that period, they drove Hubbard to a friend's house, and they discussed with him and each other whether to conceal his presence from the police. They decided that they should, for neither of them mentioned Hubbard while speaking to Skordahl through the passenger door of Johnson's car. Given the uncontroverted nature of Johnson's testimony, it cannot reasonably be disputed that Johnson and D.D. reflected beforehand on what they later told Skordahl, or that they consciously and intentionally omitted part of what they had observed. Accordingly, their statements were not excited utterances within the meaning of ER 803(a)(2).
¶ 21 Having concluded that Johnson's and D.D.'s hearsay statements were improperly admitted, we next inquire whether the remaining evidence is sufficient to support Count I. As already seen, Count I alleged that Hochhalter violated a no-contact order "by having contact with and intentionally assaulting [D.D.]."[28] By virtue of this charge, the State was obligated to prove that Hochhalter had assaulted D.D. Neither Johnson nor Hubbard saw him do that, D.D. did not testify, and there were no other witnesses. Without D.D.'s statements to Hubbard, the evidence is insufficient to support Count I, and that count must be reversed.[29]
¶ 22 Hochhalter does not ask us to address whether Johnson's and D.D.'s hearsay statements prejudicially affected Counts II and III. In his first assignment of error, he claims only that D.D.'s statements prejudicially affected Count I. In his other assignments of error, he does not claim that Johnson's or D.D.'s hearsay statements prejudicially affected Counts II and III. And even if we were to address whether Johnson's and D.D.'s statements prejudicially affected Counts II and III, we would conclude that they did not, and that their erroneous admission was harmless beyond a reasonable doubt. D.D.'s statements could not have affected the outcome on Count II, which charged that Hochhalter had assaulted Johnson, for she did not claim to have seen Hochhalter fire his gun in Johnson's direction. D.D.'s statements could not have affected the outcome on Count III, which charged that Hochhalter had unlawfully possessed a firearm, for other evidence in the record overwhelmingly established the same point. Johnson's statements could not have affected the outcome on either count; Hochhalter impeached her with some that differed from her trial testimony, and the remainder were merely cumulative. Our reversal of Count I does not affect Counts II and III.

*110 II.
¶ 23 Hochhalter contends that Instructions 18 and 19 did not comply with State v. Anderson,[30] in which the Supreme Court held that "knowing possession" of a firearm is an element of unlawful possession of a firearm in the second degree.[31] The State concedes error but argues it was harmless under cases like State v. Thomas,[32]State v. Brown,[33] and Neder v. United States.[34]
¶ 24 In this case, as far as the record shows, neither counsel checked to see whether the jury instructions contained a knowledge element, and hence neither objected on that basis. The reason, undoubtedly, was that knowledge was not really in issue in the trial. The State's witnesses claimed that Hochhalter had fired a gun at the park-and-ride. Hochhalter claimed through an alibi witness that he had not been there at all. Hochhalter did not claim that he had been there with a gun he did not know about, or even that he had been there without a gun. When the jury rejected the alibi witness and found that Hochhalter had been there, it necessarily found, in addition, that Hochhalter had been there with a gun that he knew about. Although inexplicably omitted,[35] the lack of a knowledge element was harmless beyond a reasonable doubt.

III.
¶ 25 Citing Blakely v. Washington,[36] Hochhalter contends that the trial court violated his Sixth Amendment right to jury trial when it found without a jury that he was on community placement on March 29, 2004, and then used that fact to increase his sentence. We agree.
¶ 26 In Blakely, the jury found facts that supported, under state law, a "standard range" sentence of 49 to 53 months. Sitting without a jury, the trial judge found an additional fact ("deliberate cruelty") that supported, again under state law, an "exceptional" sentence of not more than 120 months. Based in part on the additional fact that he alone had found, the trial judge then imposed an "exceptional" sentence of 90 months. On appeal, Blakely argued that the 90-month sentence violated his Sixth Amendment right to jury trial because the additional fact was essential to support the sentence but had not been found by the jury.
¶ 27 The United States Supreme Court agreed, stating two propositions pertinent here: (1) "`Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury'";[37] and (2) for purposes of the Sixth Amendment, the "prescribed statutory maximum" is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."[38] If the Court had substituted the second proposition into the first, it would have stated: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond [the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant] must be submitted to a jury." In sum then, the Court held that an accused has a Sixth Amendment right to have the jury find each fact needed to support his or her sentence,[39] except, at *111 least for now,[40] the fact of a prior conviction.
¶ 28 A three-step analysis will disclose whether Blakely's holding impacts a given sentence. The first step is to identify the sentence that the trial judge actually imposed. The second step is to ascertain the maximum sentence that the trial judge could have imposed based solely on the jury's findings and any scorable prior convictions (the maximum permissible sentence). The third step is to compare the results of the first two. If the actual sentence exceeds the maximum permissible sentence, it violates the Sixth Amendment. If the actual sentence equals or is less than the maximum permissible sentence, it does not violate the Sixth Amendment. Given the constitutional nature of Blakely's holding, the analysis is not subject to or affected by statutory state-law labels such as "standard range sentence" and "exceptional sentence."[41]
¶ 29 In this case, the trial court actually imposed 60 months on Count I, 57 months on Count II, and 43 months on Count III. Unless Blakely's exception for prior convictions applies, the most that the trial court could have imposed, based solely on the jury's findings and Hochhalter's countable prior convictions, was 54 months on Count I, 43 months on Count II, and 29 months on Count III. Unless Blakely's exception for prior convictions applies, the trial court abridged Hochhalter's Sixth Amendment right to trial by jury.
¶ 30 The State claims that Blakely's exception applies. It argues "[t]here is no meaningful distinction between the fact of a prior conviction and the fact that the defendant was on community placement as a result of such prior conviction."[42]
¶ 31 In State v. Jones,[43] Division One rejected this argument. It reasoned (1) that Blakely's exception does not encompass facts not apparent from the face of the prior conviction itself, and (2) that because of "variables" such as pre-conviction credit for time served, pre-conviction good time, and post-conviction earned early release time, "whether one convicted of an offense is on community placement or community custody at the time of the current offense cannot be determined from the fact of a prior conviction."[44] Thus, the court concluded that "whether one convicted of a crime is on community placement at the time of the [current] offense is a factual determination subject to the Sixth Amendment requirement that a jury make the determination beyond a reasonable doubt."[45]
¶ 32 In State v. Hunt,[46] Division Three rejected Jones with one judge dissenting. *112 The Hunt court seems to have reasoned in part[47] (1) that Blakely affects "exceptional sentences" but not "standard range sentences," and (2) that Blakely's exception for prior convictions encompasses whether an accused is on community custody at a later time. We disagree with the first proposition because Blakely's holding is constitutional in nature and hence, as noted earlier, is not affected by statutory state-law labels such as "standard range sentence" and "exceptional sentence." We disagree with the second proposition because Blakely's exception for prior convictions should be limited to facts that appear in the prior conviction itself, and, as Jones correctly held, such facts do not include whether the offender was still on supervision at the time of his current crime. Concluding that Jones is persuasive and that Hunt is not, we hold that Blakely's exception for prior convictions does not encompass facts not on the face of the conviction; that one such fact is whether the defendant was on community placement at the time of his current offense; and that Hochhalter, like Jones, had a Sixth Amendment right to have a jury decide whether he was on community placement at the time of his current crimes.
¶ 33 The State suggests[48] that Hochhalter lost his Sixth Amendment right to jury trial because he did not raise it before the trial court. The issue is of constitutional magnitude, however, so it may be raised for the first time on appeal.[49]
¶ 34 The State suggests and the dissent asserts that Hochhalter lost his right to jury trial because, in a signed declaration dated July 14, 2004, he acknowledged that he was on community placement at the time of his current offenses. They both focus, apparently, on the Blakely Court's statement that the maximum sentence a judge may constitutionally impose is the maximum sentence that he or she "may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."[50] When the Blakely Court said that, however, it was referring to the admissions that a defendant makes in conjunction with a waiver of his or her right to trial by jury. Referring to Blakely's precursor, Apprendi v. New Jersey,[51] the Blakely Court explained elsewhere in its opinion:
[N]othing prevents a defendant from waiving his Apprendi rights. When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding. See Apprendi, 530 U.S., at 488, [120 S.Ct. 2348] ...; Duncan v. Louisiana, 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). If appropriate waivers are procured, States may continue to offer judicial factfinding as a matter of course to all defendants who plead guilty. Even a defendant who stands trial may consent to judicial factfinding as to sentence enhancements, which may well be in his interest if relevant evidence would prejudice him at trial.[52]
Hence, the question here is not simply whether Hochhalter "admitted" or "acknowledged" that he was on community placement at the time of his current crimes; it is whether he did that and knowingly, voluntarily, and intelligently waived his Sixth Amendment right to jury trial.
¶ 35 As noted earlier, the record here does not show that Hochhalter was informed of, much less intended to relinquish, his right to have a jury decide whether he was on *113 community placement on March 29, 2004.[53] On the contrary, it shows only that his counsel did not disagree with the State's assertion that he was on community placement at that time. Accordingly, the remarks we recently made in State v. Borboa[54] are equally apropos here:
Although a defendant can waive his Sixth Amendment right to jury trial, he or she must do so knowingly, voluntarily, and intelligently.... [Borboa] did not know of or agree to forgo his right to have a jury find the facts needed to support a sentence above the standard range. Thus, he did not knowingly, voluntarily, or intelligently waive his Sixth Amendment right to have a jury find such facts.[55]
¶ 36 Finally, the State contends that any violation of Hochhalter's right to a jury was harmless beyond a reasonable doubt. In State v. Hughes,[56] however, the Washington Supreme Court held that "[h]armless error analysis cannot be conducted on Blakely Sixth Amendment violations."[57] Accordingly, we conclude that Hochhalter is entitled to be resentenced.
¶ 37 The conviction on Count I is reversed. Although the convictions on Counts II and III are affirmed, the sentences on those counts are vacated, and the case is remanded to the superior court.
I concur: HOUGHTON, J.
QUINN-BRINTNALL, C.J. (dissenting).
¶ 38 I concur with the majority that D.D.'s statements were improperly admitted under the excited utterances exception to the rule excluding hearsay evidence and that without them the evidence was insufficient to support a jury verdict finding Daniel Hochhalter guilty of violating a no-contact order as alleged in Count I. I also agree that the improper admission of D.D.'s statements did not affect the jury's verdicts on Counts II and III. Thus, I concur in the majority opinion reversing Count I and affirming Counts II and III.
¶ 39 But I dissent from the majority as to whether the sentencing court violated Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), when it included one point in Hochhalter's offender score for being on community placement at the time he committed the offense as required by RCW 9.94A.525(17). In his signed Declaration of Criminal History dated July 14, 2004, 20 days after the Supreme Court issued its decision in Blakely, Hochhalter acknowledged that he was on community placement at the time of the offense. Thus, the trial *114 court relied only on matters decided by the jury (the date of the current offense) and admitted by the defendant (that he was on community placement) when it calculated Hochhalter's offender score. Because the sentencing court determined Hochhalter's offender score from his criminal conviction history and facts admitted by the defendant or found by the jury only, it did not violate Hochhalter's Sixth Amendment right to a jury trial. Blakely, 542 U.S. at 303, 124 S.Ct. 2531.
¶ 40 I concur in the result but dissent from the majority's holding that on remand Blakely prohibits the sentencing court from adding one point to Hochhalter's offender score as required by this record and RCW 9.94A.525(17).
NOTES
[1] Judge J. Dean Morgan heard oral argument in this case while serving as a member of this court. Since retired, he is now serving as Judge Pro Tempore.
[2] Report of Proceedings (RP) at 62-63.
[3] RP at 66.
[4] RP at 68.
[5] RP at 69.
[6] RP at 147. The Safeway was near I-5 and 134th Street, while the friend's house was near Mill Plain Boulevard and 164th Avenue.
[7] RP at 76.
[8] RP at 72. Johnson testified to both periods of time.
[9] RP at 83.
[10] RP at 181.
[11] RP at 162.
[12] Clerk's Papers (CP) at 7.
[13] RP at 88-90.
[14] CP at 29.
[15] CP at 30.
[16] See RCW 9.94A.525(17) ("If the present conviction is for an offense committed while the offender was under community placement, add one point."); Laws of 2001, ch. 10, section 6 (recodifying RCW 9.94A.360 as RCW 9.94A.525).
[17] Br. of Appellant at 21 (emphasis omitted).
[18] ER 802; ER 801(c).
[19] 56 F.R.D. 183, Advisory Committee's Note at 304 (1975). Accord, State v. Brown, 127 Wash.2d 749, 758, 903 P.2d 459 (1995) ("`[U]nder certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control.' The utterance of a person in such a state is believed to be `a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock,' rather than an expression based on reflection or self-interest.") (quoting State v. Chapin, 118 Wash.2d 681, 686, 826 P.2d 194 (1992) (quoting 6 JOHN HENRY WIGMORE, EVIDENCE § 1747, at 195 (1976))).
[20] Brown, 127 Wash.2d at 758, 903 P.2d 459 (quoting State v. Strauss, 119 Wash.2d 401, 416, 832 P.2d 78 (1992)) (emphasis added) (internal quotations omitted).
[21] 127 Wash.2d 749, 903 P.2d 459.
[22] Brown, 127 Wash.2d at 753, 903 P.2d 459.
[23] The facts and quotation in this sentence are not in the Supreme Court's opinion, but they appear in the Court of Appeals' opinion that the Supreme Court was reviewing. State v. Brown, noted at 75 Wash.App. 1025 slip op. at 2, 1994 WL 910794 (1994) (Brown I). The amount of time that elapsed between the alleged rape and the 911 call is not clear. T.G. called 911 at 5:08 A.M. and said she had been raped "about 10 minutes earlier." Brown I, slip op. at 1. A few minutes after speaking with 911, however, she told an officer that she had been raped at about 2:30 A.M. Brown I, slip op. at 2.
[24] Brown, 127 Wash.2d at 759, 903 P.2d 459.
[25] Brown, 127 Wash.2d at 759, 903 P.2d 459.
[26] Br. of Resp't at 14.
[27] See State v. Freigang, 115 Wash.App. 496, 508-11, 61 P.3d 343 (2002) (Morgan, J., concurring), review denied, 149 Wash.2d 1028, 78 P.3d 656 (2003).
[28] CP at 7.
[29] In light of this conclusion, we need not address the confrontation portion of Hochhalter's first assignment of error, or his second assignment of error.
[30] 141 Wash.2d 357, 5 P.3d 1247 (2000).
[31] Anderson, 141 Wash.2d at 359, 5 P.3d 1247.
[32] 150 Wash.2d 821, 845, 83 P.3d 970 (2004).
[33] 147 Wash.2d 330, 339-40, 58 P.3d 889 (2002).
[34] 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).
[35] The trial in this case took place almost four years after Anderson was decided.
[36] 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).
[37] Blakely, 542 U.S. at 301, 124 S.Ct. 2531 (quoting Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)).
[38] Blakely, 542 U.S. at 303, 124 S.Ct. 2531 (emphasis omitted).
[39] Blakely, 542 U.S. at 313, 124 S.Ct. 2531 ("every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment").
[40] In his concurring opinion in Shepard v. United States, 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), Justice Thomas asserts that a majority of the Justices then on the Court disfavor this exception.
[41] State v. Jones, 126 Wash.App. 136, 139-40, 107 P.3d 755 (2005) ("While standard range sentences, not exceptional sentences, are at issue in these appeals, the principle of Blakely nonetheless applies to the findings at issue here."), review granted, 155 Wash.2d 1017, 124 P.3d 659 (2005). But see State v. Hunt, 128 Wash.App. 535, 541-42, 116 P.3d 450 (2005), discussed infra, and State v. Brown, 128 Wash.App. 307, 116 P.3d 400 (2005). Hunt and Brown are essentially the same on the issue involved here, so hereafter we refer only to Hunt.
[42] Br. of Resp't at 33.
[43] 126 Wash.App. 136, 107 P.3d 755.
[44] Jones, 126 Wash.App. at 143, 107 P.3d 755.
[45] Jones, 126 Wash.App. at 144, 107 P.3d 755. At least two out-of-state courts concur. See State v. Benenati, 203 Ariz. 235, 52 P.3d 804, 810 (App.2002); State v. Perez, 196 Or.App. 364, 102 P.3d 705, 709 (2004), review granted, 2005 Or. LEXIS 396; State v. Wissink, 617 S.E.2d 319, 324-5 (N.C.Ct.App.2005). At least one does not. People v. Scott, ___ P.3d ___, 2005 WL 2877851 (Colo.App. 2005). Other courts have decided cases in which, under the relevant statutory scheme, a defendant's having been on probation or parole at the time of the current crime operates not to increase the otherwise available maximum, but only as a factor to consider when deciding whether to impose the otherwise available maximum. See, e.g., People v. Black, 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 113 P.3d 534, 545-46 (2005); State v. Maugaotega, 107 Hawai'i 399, 114 P.3d 905, 915-16 (2005); Ryle v. State, ___ N.E.2d ___, 2005 WL 3378469 (Ind. 2005); State v. Lett, 161 Ohio App.3d 274, 829 N.E.2d 1281, 1287 (2005), review granted, 107 Ohio St.3d 1406, 836 N.E.2d 1227 (2005); State v. Gomez, 163 S.W.3d 632, 661 (Tenn.2005). However, such cases are not on point here.
[46] 128 Wash.App. 535, 116 P.3d 450. See also State v. Brown, 128 Wash.App. 307, 116 P.3d 400; and footnote 41.
[47] The Hunt court also may have reasoned that Hunt was sentenced on or before May 27, 2004; that Blakely was not decided until June 24, 2004; and hence that Blakely did not apply. See Hunt, 128 Wash.App. at 542, 116 P.3d 450 (Blakely does "not implicate earlier decisions upholding judicial fact-finding" and "the evidence sufficiently supports" the trial judge's finding that Hunt was under supervision on the date of his current crime). We do not consider the propriety of such reasoning here, because Hochhalter's sentencing took place on July 14, 2004, about three weeks after Blakely came down.
[48] Br. of Resp't at 22-23.
[49] RAP 2.5(a)(3); State v. Walsh, 143 Wash.2d 1, 7, 17 P.3d 591 (2001).
[50] Blakely, 542 U.S. at 303, 124 S.Ct. 2531 (some emphasis omitted).
[51] 530 U.S. at 466, 120 S.Ct. 2348.
[52] 542 U.S. at 310, 124 S.Ct. 2531.
[53] Here lies the key difference between this opinion and the dissent. The dissent does not disagree with our analysis of Blakely. It reasons, however, that Hochhalter waived his Sixth Amendment right to jury, even though nothing in the record shows that he knew of that right or voluntarily and intelligently chose to relinquish it. In our view, such reasoning is contrary to the federal constitution as interpreted by the United States Supreme Court. Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (waiver of right to jury trial is valid only if defendant had "sufficient awareness of the relevant circumstances and likely consequences"); Boykin v. Alabama, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (United States Supreme Court will not "presume a waiver" of the Sixth Amendment right to a jury trial "from a silent record"); State v. Stegall, 124 Wash.2d 719, 731, 881 P.2d 979 (1994) (court may not infer waiver "[i]n the absence of either a personal expression from the defendant waiving a 12-person jury, or an indication that either counsel or the judge discussed this right with the defendant"). See also State v. Wissink, 617 S.E.2d 319, 324-5 (N.C.Ct.App.2005) (defendant's stipulation not a valid waiver because he did not know he had a constitutional right to have a jury decide whether he committed the offense while on probation); State v. Ross, 196 Or.App. 420, 423, 102 P.3d 755 (2004) ("Nothing in the record indicates that defendant knew that he had a right to a jury trial on the asserted aggravating factors or that he intended his plea to serve as a waiver of that right. We conclude that defendant did not validly waive the right to a jury trial with respect to the aggravating factors.").
[54] 124 Wash.App. 779, 102 P.3d 183 (2004), review granted, 154 Wash.2d 1020, 116 P.3d 398 (2005).
[55] Borboa, 124 Wash.App. at 792, 102 P.3d 183 (footnote omitted).
[56] 154 Wash.2d 118, 110 P.3d 192 (2005).
[57] Hughes, 154 Wash.2d at 148, 110 P.3d 192; see also State v. Thomas, 150 Wash.2d 821, 849, 83 P.3d 970 (2004).