[No. 38151-6-II. Division Two. February 2, 2010.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSE ALVAREZ-ABREGO, *Appellant*.

352

354

*John A. Hays*, for appellant.

*L. Michael Golden, Prosecuting Attorney*, and *Lori E. Smith, Deputy*, for respondent.

¶1 VAN DEREN, C.J. — Jose Alvarez-Abrego appeals his conviction for second degree child assault,[1] arguing that the trial court erred by admitting double hearsay evidence that the child victim was thrown against a wall, thus violating his Sixth Amendment[2] right to confrontation under *Crawford*,[3] and that the evidence was insufficient to support his conviction. In his statement of additional grounds for review,[4] he contends that his counsel was ineffective and argues other facts outside the record. We hold that any error is harmless and affirm.

## FACTS

### I. INCIDENT AND INVESTIGATION

¶2 On August 29, 2007, at approximately 1:30 PM, Kristina Rondeau left her apartment in Centralia, Washington, with her 10 year old son, BEC, for a doctor's appointment.[5] Rondeau's boyfriend, Alvarez-Abrego, periodically lived with her and often cared for the children while she was away. That afternoon, Rondeau left her four other children, including her four year old daughter RRR and six month old son MJS, in Alvarez-Abrego's care. RRR was the oldest child remaining at the apartment. No other adults were present and MJS was uninjured when Rondeau left.

¶3 Between 6:00 and 6:30 PM, Rondeau returned home and saw MJS sleeping in his baby seat. She told Alvarez-Abrego to accompany her to the store. At that point, "[Alvarez-Abrego] grabbed [MJS] and put him in the stroller and went downstairs real fast" while she readied

---

[1] RCW 9A.36.130(1).

[2] U.S. CONST. amend. VI.

[3] *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[4] RAP 10.10.

[5] We refer to child victims and witnesses by their initials to protect their rights as minors under RCW 7.69A.030(4).

the other children. Report of Proceedings (RP) (June 9, 2008) at 79-80. Alvarez-Abrego pushed MJS in the stroller on their way to and from the store. Rondeau thought that Alvarez-Abrego was acting unusually attached to MJS.

¶4 When they returned to the apartment, Rondeau noticed that the side of MJS's head was swollen behind his left ear. Rondeau immediately took MJS to a neighbor, who drove them to the Centralia hospital. Hospital staff decided to transfer MJS to Mary Bridge Children's Hospital in Tacoma.

¶5 At Mary Bridge, Dr. Yolanda Duralde examined MJS twice over the period of several hours. She determined that MJS had suffered a complex skull fracture behind his left ear and that he had significant bleeding under his scalp. Duralde also diagnosed a healing fracture to MJS's rib and chip fractures to his wrist and ankles. Rondeau told Dr. Duralde that RRR said that Alvarez-Abrego had thrown MJS against the wall.

¶6 While Rondeau and MJS were at the hospital, Centralia Police Officer Ruben Ramirez interviewed Alvarez-Abrego at the apartment. Ramirez asked if Alvarez-Abrego knew what had happened to MJS. Alvarez-Abrego responded that, earlier the previous day, while he was putting on his shoes and socks in the bedroom, he heard MJS begin to cry. When Alvarez-Abrego found MJS, he was on the carpet with his siblings, crying. Alvarez-Abrego also told Ramirez that he took MJS and the other children to the store while Rondeau was away but that he did not see anything happen to MJS.

¶7 Centralia Police Officer Carl Buster arrested Alvarez-Abrego. When Buster asked Alvarez-Abrego if he had thrown MJS against the wall, Alvarez-Abrego paused and then in a soft voice denied throwing MJS. Alvarez-Abrego suggested that one of the other children may have caused MJS's injuries.

¶8 The State charged Alvarez-Abrego with second degree child assault by either (1) "recklessly inflicting substantial

bodily harm" or (2) "caus[ing] bodily harm that was greater than transient physical pain or minor temporary marks" after "having previously engaged in a pattern or practice of either assaulting the child which had resulted in bodily harm that was greater than transient pain or minor temporary marks, or causing the child physical pain or agony that was equivalent to that produced by torture." Clerk's Papers at 92-93; *see* RCW 9A.36.130(1)(b).

## II. TRIAL

¶9 On the morning of trial, the State asked the trial court to rule under the ER 803(a)(4) medical hearsay exception[6] on the admissibility of Duralde's likely testimony that Rondeau told her that RRR said that Alvarez-Abrego threw MJS against the wall. Alvarez-Abrego objected, arguing that (1) the State chose to forgo a competency hearing for RRR, (2) the statement was hearsay upon hearsay without a hearsay exception for RRR's statement to her mother, and (3) identification of the alleged perpetrator did not further Duralde's medical diagnosis under the hearsay exception. The State chose not to call RRR as a witness on the advice of her counselor, not because RRR was an incompetent witness.

¶10 Impliedly overruling the threshold issue of double hearsay, the trial court ruled that Duralde could not name who purportedly threw MJS against the wall but that she could testify that MJS sustained his injuries after being thrown against a wall because the means by which the injury occurred was reasonably pertinent to the doctor's diagnosis and treatment.[7]

¶11 At trial, Duralde testified that MJS suffered a "stelly fracture" with multiple fractures radiating from the impact

---

[6] Under ER 803(a)(4), admissible statements include those "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

[7] The trial court also ruled that Buster could not testify that he heard that Alvarez-Abrego threw MJS against the wall.

point on his skull. RP (June 9, 2008) at 41-42. She explained that, unlike simple, straight linear fractures that occur when children fall from short heights, the amount of blunt force trauma necessary to cause MJS's fracture was equivalent to a fall from 10 to 20 feet—likely more force than a five year old sibling[8] could cause by dropping MJS in the apartment.

> [THE STATE:] So based on your training and experience, do you think that a five-year-old child could hold a 16- to 18- pound infant and generate enough force to that infant to cause the kind of fracture you saw in [MJS]?
>
> . . . .
>
> [DURALDE:] I think it -- that's quite a heavy child for a little kid to pick up, and depending -- I don't think they could pick them up high enough. The only way they could probably generate enough force is if they hit them against something specific, a corner of something or a toy of some sort. Even then, they probably wouldn't have enough force to actually make that fracture occur. So that would be difficult just because the kid weighs so much in comparison to the five-year-old.

RP (June 9, 2008) at 44-45.

¶12 She also explained that, because an infant's skull is still pliable, it is harder to fracture than an adult's skull; therefore, MJS's head likely hit a hard surface, such as a wall or a concrete or wood floor. When children are dropped, roll off furniture, or experience similar short falls, Duralde saw "skull fractures or clavicular fractures about one percent of the time."[9] RP (June 9, 2008) at 42.

---

[8] RRR was four at the time. In closing, the State said that it asked the doctor about a hypothetical five year old to further demonstrate that RRR could not have caused these injuries.

[9] On cross-examination, Duralde agreed that it was possible, but unlikely, that a five year old could have caused this injury and that it was more likely if the older child fell on MJS.

¶13 According to Duralde, MJS would definitely have experienced pain following his skull injury comparable to a bad headache followed by a low, dull ache:

[THE STATE:] . . . So if a child were to suffer a fracture like the one you saw in [MJS], would you expect that child to continue crying for a long period of time or to cry and then cease crying after some short period of time?

[DURALDE:] I'd expect him to keep crying until someone soothed him, unless there was something else going on with him. If he cried and then stopped crying abruptly, I would be concerned about some kind of concussion or some other injury to his head, specifically to his brain. Otherwise, most kids would cry for a while and -- until somebody comforted them and then they will calm down.

RP (June 9, 2008) at 47-48. Moreover, Duralde explained, the significant bleeding and swelling pushed MJS's scalp away from his skull, displaced his left ear, and would have caused him continuous pain.

¶14 Duralde added that the healing chip fractures to MJS's wrist and ankles were characteristic of child abuse and that the healing fractured rib was most likely caused by squeezing.[10] These injuries would also cause MJS more pain at first and then less as they healed, unless the site were touched or disturbed again.

¶15 Explaining that doctors need to know what happened to accurately diagnose and treat their patients' injuries, Duralde testified that she reviewed MJS's medical test results and asked Rondeau about his medical history. When the State asked Duralde what RRR told her mother, the defense objected, arguing outside the jury's presence that the statement was unnecessary to diagnose MJS's injuries and thus constituted hearsay. After the State's brief voir dire of Duralde the trial court overruled the defense objection.

---

[10] Rondeau denied ever forcefully pulling on MJS's feet or squeezing his ribcage.

¶16 When the jury returned, the State continued its examination:

[THE STATE:] When you talked to [MJS]'s mother, [Rondeau], did she tell you about any possible causes of the injury?

[DURALDE:] Yes.

[THE STATE:] What did she tell you?

[DURALDE:] She told me that one of her children had told her earlier that day that the baby had been thrown against the wall.

[THE STATE:] Did she say how old the child was that told her that?

[DURALDE:] Her four-year-old.

RP (June 9, 2008) at 58-59. Duralde did not testify that RRR named Alvarez-Abrego as the one who threw MJS against the wall. But Duralde did testify that MJS's injuries "were consistent with someone hurting him as opposed to having experienced accidental injury" and ultimately concluded that "the history that fit[ ] his injury was that he had been thrown against the wall." RP (June 9, 2008) at 40-41.

¶17 Rondeau's oldest child, BEC, testified that, when Alvarez-Abrego was alone with the children, he would swing MJS around by his ankles and that he had done this on multiple occasions. Vicky Moore, Rondeau's neighbor who also occasionally cared for MJS, testified that on August 29 or 30 she heard "a sick cry, a hurt cry of pain" from MJS--different than she had ever heard before--and then the crying quickly stopped and it was "totally quiet. I didn't even hear the kids--nobody in there." RP (June 9, 2008) at 64.

¶18 During closing argument, the State argued that Duralde's testimony named Alvarez-Abrego as the cause of MJS's injuries: "We also know [MJS] was thrown against the wall from the doctor learning her patient's history. The doctor was told by [Rondeau] that her four-year-old daughter had told her [that Alvarez-Abrego] threw the baby

against the wall." RP (June 10, 2008) at 62. The defense objected unsuccessfully. During rebuttal, the State omitted the defendant's name, "It's evidence, the mother, for purposes of medical diagnosis and help, to get help, told the doctor her four-year-old said the baby was thrown against the wall." RP (June 10, 2008) at 74.

¶19 After the trial court excused the jury, Alvarez-Abrego moved for a mistrial, arguing that the State's closing argument violated the trial court's pretrial order by saying that RRR specifically accused Alvarez-Abrego of throwing MJS against the wall. The trial court denied the motion because the State's misstatement of the evidence was not evidence and the defense chose not to point out the discrepancy during its closing argument.

¶20 The jury convicted Alvarez-Abrego of second degree child assault and returned a special verdict convicting him under both charged alternatives. He appeals.

## ANALYSIS

HEARSAY AND THE CONFRONTATION CLAUSE

■ ¶21 Alvarez-Abrego first argues that admission of RRR's out-of-court statement to her mother, that was repeated to Duralde, amounted to constitutional and evidentiary error under the Sixth Amendment's confrontation clause and ER 803(a)(4), respectively. The constitutional right and the evidentiary rule provide independent grounds for objection and a defendant may invoke one without regard to whether the evidence is objectionable under the other. *See California v. Green*, 399 U.S. 149, 155-56, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970).

A. Standard of Review

■ ■ ¶22 We review alleged confrontation clause violations de novo. *State v. Kronich*, 160 Wn.2d 893, 901, 161 P.3d 982 (2007). Furthermore, we review de novo a trial court's interpretation of evidentiary rules as a matter of law. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786

(2007). If the trial court's interpretation of the rules is correct, we determine if admission of the evidence was an abuse of discretion. *Foxhoven*, 161 Wn.2d at 174. A trial court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds. *Foxhoven*, 161 Wn.2d at 174.

## B. Confrontation Clause

■ ¶23 Alvarez-Abrego contends that admission of RRR's statement concerning MJS being thrown into a wall violated his Sixth Amendment confrontation clause rights under *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) because the statement was testimonial. The State claims that this statement was nontestimonial because RRR made it during a private conversation with her mother. The State has the burden on appeal of establishing that statements are nontestimonial. *State v. Koslowski*, 166 Wn.2d 409, 417 n.3, 209 P.3d 479 (2009). Here, even though the State does not show that the daughter's statements are nontestimonial, we hold that any error was harmless.

■ ¶24 The Sixth Amendment to the United States Constitution[11] and article I, section 22 of the Washington Constitution[12] guarantee criminal defendants the right to confront and cross-examine witnesses. The confrontation clause provides that the State can present testimonial statements of an absent witness only if the witness is unavailable and the defendant has had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 59. But the State can present nontestimonial out-of-court statements

---

[11] "[T]he accused shall enjoy the right to . . . be confronted with the witnesses against him." U.S. Const. amend. VI. Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (quoting U.S. Const. amend. VI). This right was made applicable to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[12] Under Washington's constitution, the accused also has "the right to . . . meet the witnesses against him face to face." Wash. Const. art. I, § 22.

that accord with the traditional hearsay rule and its exceptions, irrespective of the Sixth Amendment. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

■ ¶25 In *Crawford*, the United States Supreme Court specifically chose not to differentiate testimonial from nontestimonial statements. 541 U.S. at 68. Even so, the Court

> observed that the "core" class of "testimonial" statements included those "pretrial statements that declarants would reasonably expect to be used prosecutorially." The Court also seemed to quote with approval a brief that described testimonial statements as "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*State v. Mason*, 160 Wn.2d 910, 918, 162 P.3d 396 (2007), (citation omitted) (internal quotation marks omitted) (quoting *Crawford*, 541 U.S. at 51-52), *cert. denied*, 553 U.S. 1035 (2008). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51.

■ ¶26 In *Davis*, the United States Supreme Court held that statements made in the course of a police investigation are nontestimonial if the primary purpose of the questioning[13] is to allow police to assist in an ongoing emergency. 547 U.S. at 822. But statements are testimonial if the primary purpose of the questioning is to establish or prove past events potentially relevant to later criminal prosecution and circumstances objectively indicate that there is no ongoing emergency. *Davis*, 547 U.S. at 822. The State argues that out-of-court statements are nontestimonial when " 'made during a private conversation.' " Br. of Resp't at 10 (quoting *Horton v. Allen*, 370 F.3d 75, 84 (1st Cir. 2004)).

---

[13] The *Davis* court examined situations of police interrogation, but it used "interrogation" in its colloquial, nontechnical meaning. 547 U.S. at 822.

¶27 Our record sheds no light on the conversation between Rondeau and RRR. All we know about this conversation is that RRR appears to have made this allegation to her mother some time during the evening of August 30. The State also mentioned before trial that RRR made "similar statements" during an interview with a Child Protective Services (CPS) employee, suggesting that RRR retold her account multiple times. RP (June 9, 2008) at 29.

¶28 The State baldly asserts that "the statement was made by [RRR] in a private conversation with her mother." Br. of Resp't at 10. But the record does not reflect how "casual," under *Crawford*, or "private," under *Horton*, this conversation was. We are unable to discern where it occurred, who was present, whether police investigators prompted Rondeau to question RRR, or whether RRR made the statement spontaneously and solely to Rondeau. In light of the multiple interviews with police, hospital staff, and CPS employees, we cannot assume, in a record devoid of factual development, that Rondeau had time for a casual, private conversation with RRR that evening.

¶29 Although our court in *State v. Hopkins*, 137 Wn. App. 441, 453, 154 P.3d 250 (2007) stated bluntly that "[a] child's hearsay statements made to family members are nontestimonial," we now clarify that such a rule requires some threshold evaluation of the underlying circumstances to meet the constitutional strictures of *Crawford* and *Davis*—an evaluation that the *Hopkins* court properly made. Here, the State failed to prove that the out-of-court statement in question was nontestimonial. Therefore, because RRR did not testify at trial, we hold that admission of her statements violated the confrontation clause.

C. Medical Hearsay Exception

¶30 Alvarez-Abrego also argues that trial court erred in allowing Duralde's testimony regarding RRR's statement because it constituted hearsay upon hearsay without a

hearsay exception at the first level.[14] To address this argument, we turn first to Washington's child hearsay statute. We then review whether the trial court admitted the statement in violation of evidentiary rules.

## 1. RCW 9A.44.120—Child Hearsay Statute—Does Not Apply

 ¶31 Our legislature created a statutory hearsay exception to admit a child's out-of-court statements under certain instances.[15] But RCW 9A.44.120 "does not by its terms apply to a statement by a child describing an act of sexual contact performed on a *different* child." *State v. Harris*, 48 Wn. App. 279, 284, 738 P.2d 1059 (1987); *see State v. Hancock*, 46 Wn. App. 672, 678, 731 P.2d 1133 (1987), *aff'd*, 109 Wn.2d 760, 748 P.2d 611 (1988). Although the present case involves physical abuse, instead of the sexual abuse in *Harris*, we similarly conclude that the

---

[14] Alvarez-Abrego further claims that the trial court erred by ruling that the doctor could testify to hearsay statements naming him as the perpetrator. But this argument misrepresents the trial court's actual ruling—that Duralde could not name who purportedly threw the baby against the wall—but she could testify that it happened. And Duralde testified in line with this ruling at trial. Accordingly, we do not address this argument.

[15] RCW 9A.44.120 provides:

A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, describing any attempted act of sexual contact with or on the child by another, or describing any act of physical abuse of the child by another that results in substantial bodily harm as defined by RCW 9A.04.110, not otherwise admissible by statute or court rule, is admissible in evidence in dependency proceedings under Title 13 RCW and criminal proceedings, including juvenile offense adjudications, in the courts of the state of Washington if:

(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings; or

(b) Is unavailable as a witness: PROVIDED, That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party his or her intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to prepare to meet the statement.

statutory language regarding "the child" applies only to the abused child. RCW 9A.44.120; *see* 48 Wn. App. at 284. RRR's out-of-court statements, therefore, fall outside this statutory hearsay exception.

## 2. ER 803(a)(4) Does Not Permit Double Hearsay of Uninjured Declarant

¶32 The State contends that the ER 803(a)(4) hearsay exception for the purpose of medical diagnosis is broad enough to admit Duralde's double hearsay testimony. "Hearsay" is a statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay evidence is not admissible unless it fits under a recognized exception to the hearsay rule, in which case we presume its reliability.[16] ER 802; *State v. Athan*, 160 Wn.2d 354, 383, 158 P.3d 27 (2007). In instances of multiple hearsay, each level of hearsay must be independently admissible. ER 805. Here, Duralde's testimony is double hearsay—RRR's statement to Rondeau is the first level of hearsay and Rondeau's report to Duralde is the second level. *See* ER 801(c).

¶33 One exception to the hearsay rule is ER 803(a)(4). Under this rule, admissible statements include those "reasonably pertinent to diagnosis or treatment." ER 803(a)(4). "To be admissible, the declarant's apparent motive must be consistent with receiving treatment, and the statements must be information on which the medical provider reasonably relies to make a diagnosis." *State v. Fisher*, 130 Wn. App. 1, 14, 108 P.3d 1262 (2005). "The rationale is that we presume a medical patient has a strong motive to be truthful and accurate. This provides a significant guarantee of trustworthiness." *State v. Perez*, 137 Wn. App. 97, 106, 151 P.3d 249 (2007).

¶34 In one case, our court suggested that ER 803(a)(4) may also encompass statements made by a pa-

---

[16] "The hearsay prohibition serves to prevent the jury from hearing statements without giving the opposing party a chance to challenge the declarants' assertions." *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 451-52, 191 P.3d 879 (2008).

tient's parent repeating the patient's words, if made for purposes of medical diagnosis or treatment. *State v. Justiniano*, 48 Wn. App. 572, 581, 740 P.2d 872 (1987). In *Justiniano*, a jury convicted the defendant of indecent liberties with his live-in girl friend's four year old daughter. 48 Wn. App. at 573-74. The trial court held a pretrial hearing to determine the admissibility of this child's out-of-court statements under the child hearsay statute, RCW 9A.44.120. The child gave limited responses on the stand. *Justiniano*, 48 Wn. App. at 574-75. Her mother apparently testified that, while washing the child in the shower, the child spontaneously said, " 'that's what [Justiniano] does with his finger, he did it for a long time and it hurt.' " *Justiniano*, 48 Wn. App. at 575. The child's 10 year old brother corroborated her story. *See Justiniano*, 48 Wn. App. at 575-76. Applying the factors of *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984), the trial court ruled that the child's remarks to her mother were admissible because they were sufficiently reliable and corroborated. *Justiniano*, 48 Wn. App. at 579-81. Accordingly, the trial court admitted the doctor's testimony under ER 803(a)(4). *Justiniano*, 48 Wn. App. at 581.

¶35 At trial, the older brother testified that he saw Justiniano "place his hand down [his sister]'s pants while she was on the couch in the family living room." *Justiniano*, 48 Wn. App. at 576. The child's pediatrician also testified that she saw the child when her mother brought her in for a physical exam. *Justiniano*, 48 Wn. App. at 576.

> The doctor was allowed to relate certain statements attributed to the child by the mother concerning acts of sexual abuse, *as well as the substance of the brother's statement as stated by the mother.* . . . In addition to relating various statements attributed to the child *and the brother*, the doctor testified as to her finding on the physical examination.

*Justiniano*, 48 Wn. App. at 576 (emphasis added). The defense counsel did not object to this testimony. Justiniano also testified, claiming that the mother fabricated the whole story. *Justiniano*, 48 Wn. App. at 576.

¶36 On appeal, Justiniano argued, among other things, that the trial court should not have allowed the doctor to testify to what the child victim told her mother. *Justiniano*, 48 Wn. App. at 581. Although we first held that the child hearsay statute satisfied the first level of hearsay, we further concluded "that the statements made to the doctor by the mother are the equivalent of statements made by the child to the doctor and are admissible under ER 803(a)(4) as statements made for purposes of diagnosis or treatment." *Justiniano*, 48 Wn. App. at 581. We reasoned that "children of tender years are incapable of expressing their medical concerns to physicians," so a parent should be allowed to do so on an injured child's behalf. *Justiniano*, 48 Wn. App. at 581.

¶37 The State points to the *Justiniano* court's factual recitation for the proposition that, under ER 803(a)(4), a physician may testify to what the victim's uninjured sibling told their parent. But Justiniano did not argue on appeal the admissibility of the brother's double hearsay, only the admissibility of the victim's statements, and our reasoning was apparently grounded on the premise that an injured child may rely on a parent to seek medical aid when the child cannot do so. *See Justiniano*, 48 Wn. App. at 581. Even if *Justiniano*'s language about ER 803(a)(4) constituted a holding, we distinguish it because the child declarant here was not the victim.

¶38 We find no reported case admitting medical diagnosis hearsay under the present circumstances.[17] RRR did not

---

[17] In the special concurrence, our colleague asserts that a medical professional can testify to double hearsay regardless of whether an exception applies at the first level of hearsay. To support this claim, the concurrence partially quotes from *Washington Practice*. The full quotation is as follows:

The cases interpreting [ER 803(a)(4)], however, suggest that its scope is much broader than it first appears to be. For example, there is nothing in the rule to suggest that the hearsay exception applies only to statements describing the patient's *own* symptoms or medical history. The instant hearsay exception may apply, for example, to a *parent's* statements to a physician concerning the medical needs of the parent's child, or to statements by *some other third person*, who was seeking to convey information about a patient to a physician.

seek medical treatment, so her remark lacked the same "guarantee of trustworthiness." *Perez*, 137 Wn. App. at 106. Therefore, we hold that the trial court erred in admitting the statements as double hearsay from an uninjured declarant under ER 803(a)(4).

D. Harmless Error

¶39 Next, we determine whether the admission of RRR's statements in violation of the confrontation clause and ER 803(a)(4) was nevertheless harmless. "The admission of a hearsay statement in violation of the confrontation clause is a classic trial error. This is so because a reviewing court may evaluate the possible effect of the hearsay statement in the context of all the evidence presented at trial." *State v. Watt*, 160 Wn.2d 626, 633, 160 P.3d 640 (2007). "[C]onstitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless." *Watt*, 160 Wn.2d at 635. "If the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt, the error is harmless." *Koslowski*, 166 Wn.2d at 431.

¶40 Here, aside from Duralde's constitutionally flawed hearsay testimony, the State has established overwhelm-

5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.20 author's cmt., at 67-68 (5th ed. 2007) (some emphasis added) (footnote omitted) (citing *State v. Woods*, 143 Wn.2d 561, 23 P.3d 1046 (2001); *Justiniano*, 48 Wn. App. 572). This first scenario involving a parent speaks to *Justiniano*, which we address in the opinion. The second scenario involving "some other third person" replaces the parent in the first scenario as the patient's intermediary. 5C TEGLAND, *supra*, § 803.20, at 68; *Woods*, 143 Wn.2d at 601-03.

At most, in *Woods* our Supreme Court expanded what information is "reasonably pertinent to diagnosis or treatment" under ER 803(a)(4). *See* 143 Wn.2d at 602-03. The court held that medical professionals can testify to statements by a nonpatient declarant about a patient where those statements were "reasonably pertinent to either immediate physical or eventual psychological treatment" of the patient or the declarant. *Woods*, 143 Wn.2d at 603. *Woods* does not stand for the proposition that the ER 803(a)(4) exception independently cleanses double hearsay without application of a second exception. Rather, medical professionals testified at trial to a deceased victim's recollection of the defendant's own words and, as the declarant, his statements were nonhearsay under ER 801(d)(2)(i). *See Woods*, 143 Wn.2d at 601-02. In sum, we read neither *Woods* nor *Washington Practice* to undercut ER 805's requirement that each level of hearsay be independently admissible, and we respectfully disagree with the concurrence on this point.

ing, untainted evidence of Alvarez-Abrego's guilt. MJS was injury free when Rondeau left him in Alvarez-Abrego's care that afternoon. When Rondeau returned, Alvarez-Abrego concealed MJS from her by grabbing and keeping him in the stroller during their trip to the store. There is no evidence that Alvarez-Abrego told Rondeau that MJS fell while Alvarez-Abrego was putting on his shoes in the bedroom or that he discovered the injuries following that purported fall. Rondeau noted that Alvarez-Abrego was acting in an unusual manner toward MJS when she returned but she did not ask to see or hold MJS until they returned to the apartment from the store. When she finally saw MJS, his head was grossly swollen, pushing his scalp away from his skull and changing the placement of his left ear. Additionally, Rondeau's oldest child verified that Alvarez-Abrego would swing MJS around by his ankles when Rondeau was away. And their neighbor heard MJS give a sickly, painful cry that quickly stopped, something she had never heard him do before.

¶41 The medical evidence supported this testimony and pointed singularly to an assault by an adult. MJS suffered a complex fracture to his skull caused by a significant blunt force trauma. There was evidence that prior child abuse had caused fractures to his wrist, ankles, and rib. Duralde testified that MJS's injuries "were consistent with someone hurting him as opposed to having experienced accidental injury"; thus, disregarding her ultimate conclusion that "the history that fit[ ] his injury was that he had been thrown against the wall," the overwhelming evidence shows that, as sole caretaker during Rondeau's absence, Alvarez-Abrego caused the trauma to MJS. RP (June 9, 2008) at 40-41.

¶42 Alvarez-Abrego's theory was that either MJS fell and hit his head or that RRR caused the injury to her brother. But Duralde cast significant doubt on both possibilities. First, to fracture a child's skull to that degree would require a 10 or 20 foot drop, nearly impossible inside their apartment. Second, that type of fracture occurs only "one

percent of the time" from falls of the type that Alvarez-Abrego suggested occurred. RP (June 9, 2008) at 42. Third, the oldest child at the apartment with Alvarez-Abrego, four year old RRR, was likely not strong enough to lift her brother and apply sufficient force to fracture his skull in that fashion. And Rondeau testified that she had never seen RRR carry MJS. Finally, the room where Alvarez-Abrego claims MJS fell was carpeted, further reducing the possibility of an accidental injury. Therefore, we hold that any constitutional error was harmless.

¶43 Nonconstitutional error in admitting hearsay evidence requires reversal only if it is reasonably probable that the error materially affected the trial's outcome. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). Consistent with our holding that the constitutional error was harmless, we hold that admission of the hearsay statement in violation of ER 803(a)(4) was unlikely to have materially affected Alvarez-Abrego's conviction and was, therefore, harmless.

¶44 Affirmed.

¶45 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

ARMSTRONG, J., concurs.

¶46 QUINN-BRINTNALL, J. (concurring in the result only) — I agree with the majority's decision that the evidence amply supports Jose Alvarez-Abrego's second degree child assault conviction and that it should be affirmed. I write separately, however, because I respectfully disagree with the majority analysis, which, in my view, improperly extends application

of *Crawford*[18] and unduly limits statements admissible under the medical diagnosis exception to the rule against hearsay.

¶47 First, I note that a fair reading of the record reveals that the statement at issue was made by a four-year-old child to her mother after the mother discovered her six-month-old son had sustained a head injury while in her boyfriend, Alvarez-Abrego's care and before the child was examined in the emergency room of the Mary Bridge Children's Hospital. Any subsequent interviews did not alter the character of the child's initial statement to her mother, which, in turn, her mother relayed to Dr. Yolanda Duralde. ER 803(a)(4) expressly allows the admission of out-of-court statements such as these "made for purposes of medical diagnosis or treatment and describing . . . the inception or general character of the cause or external source . . . as reasonably pertinent to diagnosis or treatment." That rule does not, as the majority suggests, require that the statements be made by the person receiving medical treatment. Majority at 368 n.17; *see* 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.20 author's cmt. at 68 (5th ed. 2007) ("[T]here is nothing in [ER 803(a)(4)] to suggest that the hearsay exception applies only to statements describing the patient's *own* symptoms or medical history. The instant hearsay exception may apply, for example, . . . to statements by some other third person, who was seeking to convey information about a patient to a physician." (some alterations in original) (citing *State v. Woods*, 143 Wn.2d 561, 23 P.3d 1046 (2001))).

¶48 Moreover, I disagree with the majority's assertion that the record is insufficient to establish the nontestimonial character of the statement. As the majority acknowledges, "the 'core' class of 'testimonial' statements include[ ] those 'pretrial statements that declarants would

---

[18] *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

reasonably expect to be used prosecutorially[,]' . . . 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *State v. Mason*, 160 Wn.2d 910, 918, 162 P.3d 396 (2007) (internal quotation marks omitted) (quoting *Crawford v. Washington*, 541 U.S. 36, 51, 52, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)), *cert. denied*, 553 U.S. 1035; Majority at 363.

¶49 It was Kristina Rondeau who told Dr. Duralde that her four-year-old daughter had told her that the infant had been thrown against the wall. Both Rondeau and Duralde testified at Alvarez-Abrego's trial and were subject to cross-examination. As to the statements of a four-year-old child made after the discovery of her infant brother's injury and prior to his emergency room examination, it strains credulity to argue that a four-year-old made the pretrial statement reasonably expecting it to be used "prosecutorially" or " 'believ[ing] that the statement would be available for use at a later trial.' " *Mason*, 160 Wn.2d at 918 (quoting *Crawford*, 541 U.S. at 52). In my opinion, the majority's conclusion that the trial court committed error, albeit harmless, in admitting the child's statement to her mother which was promptly relayed to the infant's treating physician is based on groundless speculation regarding the possible context in which the statement may have been made. Accordingly, although I concur in the result, I must respectfully dissent from the analysis in the majority opinion.

Review denied at 168 Wn.2d 1042 (2010).