# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of<br>the Personal Restraint of<br><br>VERNON LEWIS CURRY, JR.,<br><br>Petitioner. | No. 54033-9-II<br><br>UNPUBLISHED OPINION |

MAXA, P.J. – In this personal restraint petition (PRP), Vernon Curry seeks relief from personal restraint imposed following his convictions of first degree murder with a firearm enhancement and first degree unlawful possession of a firearm.

Curry argues that (1) his defense counsel provided ineffective assistance of counsel by failing to (a) challenge the State's firearm ballistics expert's testimony, (b) move for a mistrial after the jury heard inadmissible hearsay, (c) object to admission of a recording of a 911 call on confrontation clause grounds, (d) request a limiting instruction regarding the 911 call, and (e) request a limiting instruction regarding a photograph that showed the word "gang"; (2) the trial court erred in admitting a recording of the 911 call into evidence; (3) cumulative error deprived him of a fair trial; and (4) his appellate counsel provided ineffective assistance of counsel.

We conclude that Curry's claims have no merit. Accordingly, we deny Curry's PRP.

FACTS

*Shooting Incident*

On September 7, 2014, at approximately 4:00 AM, Michael Ward was shot and killed in his car outside an after-hours club in Tacoma.

A surveillance video showed a man pulling a mask over his face as he approached Ward's vehicle. A witness then approached Ward and realized that he had been shot, and fired several shots toward a car in the street. Another witness told law enforcement that he saw a man in a ski mask commit the shooting. That witness also fired shots. A police officer who was nearby heard gunshots and saw a Black male with a face covering sprinting down the sidewalk carrying a dark object.

A witness who lived near where the shooting occurred observed someone running through the area. A ski mask later was discovered in that area.

On the same day as the shooting, Karin Curry – Curry's stepmother – called 911 to report her son's possible involvement in Ward's murder. During the call, Karin[1] asked for a police officer to come to her house to "talk to him regarding the shooting last night in Tacoma." PRP App. Attach. D. When the operator asked what Karin would like to speak to the officer about, she clarified: "I'm the -- I'm a parent, and I think there's a possibility that my son was involved. . . . He called me this morning and he was very distraught and so, you know . . . I'm not sure." PRP App. Attach. D.

*Investigation*

Crime scene technicians recovered multiple .38 and .40 caliber bullets and spent shell casings from the crime scene. Ten days after the shooting, a .40 caliber Sig Sauer pistol was discovered near where the ski mask was found. There were no fingerprints or matching DNA profiles on the gun. Forensic testing later found Curry's DNA on the inside of the ski mask under the eyes and the mouth, although DNA from an unknown person also was found.

---

[1] For clarity, this opinion uses Karin Curry's first name. No disrespect is intended.

The State charged Curry with first degree murder with a firearm enhancement and first degree unlawful possession of a firearm.

*Trial*

At trial, Brenda Walsh testified as the State's ballistics expert. Walsh worked as a forensic scientist in the firearm and toolmark section of the Washington State Patrol Crime Laboratory. In that capacity, she examined fired bullets and cartridge cases to determine whether they had been fired by a particular firearm.

In this case, Walsh test fired the Sig Sauer pistol and collected the fired bullets and cartridge cases. She then microscopically examined multiple cartridge cases, bullet jacket fragments, and bullet fragments that were recovered from the crime scene and compared them to each other and to the test fires. Specifically, Walsh looked for certain patterns of reproducible markings and markings with unique characteristics. Based on her analysis, Walsh concluded that seven cartridge casings, three bullet jacket fragments and three bullet fragments found at the scene were fired from the Sig Sauer pistol.

Defense counsel did not object to Walsh's testimony on the grounds that her analysis was not scientifically accepted. Defense counsel also did not cross-examine Walsh about the validity of her analysis or her ability to make conclusive statements. Instead, in a brief cross-examination he established that Walsh had no knowledge of any fingerprint analysis done on the shell casings, that there were nine additional casings that came from a different gun, and that there were bullet fragments from a third gun.

The State also called Karin as a witness. On direct examination, Karin testified that she called the police after receiving a "call from . . . [her] grandson's mother . . . saying that there was speculation that my son could possibly be involved." 8B RP at 579. Defense counsel

objected on the basis of hearsay, which the trial court sustained. The trial court later instructed the jury to disregard any evidence ruled inadmissible during trial.

Later in her testimony, Karin was asked why she called the police. She denied calling due to her suspicions regarding her son's involvement in the shooting. The State then began to play a recording of the 911 call. At some point during the recording, defense counsel asked to stop the recording and objected on the basis of hearsay, relevance, and prejudice. The trial court overruled the objection, reasoning that there was no hearsay in the recording itself, and allowed the tape to be played in its entirety.

Curry testified in his own defense. He explained that he had gone to a club with his then girlfriend on the night of the shooting. After the club, Curry and his girlfriend returned to his home around 3:00 or 3:30 AM and went to bed. Curry acknowledged that he lived roughly two miles from the crime scene and that cell tower records revealed that he was in the general location of the shooting between 3:30 and 4:30 AM.

Curry testified that he had a media company called Ylyfe Entertainment. As part of a photoshoot for Ylyfe, he wore a black ski mask similar to the one found near where the shooting occurred. But Curry claimed that his mask was in a container that had been stolen from his car months before the shooting.

During cross-examination, the State asked if Ylyfe produced music that condoned street violence. Curry denied promoting street violence through Ylyfe. The State then sought admission of a hip-hop music video produced by Ylyfe featuring Curry for the limited purpose of impeaching him as to whether Ylyfe promoted street violence. The trial court excluded the video but allowed the State to introduce two still photos of Curry with the term "Y Gang" and "Y Gang

Entertainment." 15 RP at 1623-24. The court offered to give a limiting instruction to accompany the photos, which defense counsel refused.

During closing argument, defense counsel focused on the lack of direct eyewitness identification evidence. He emphasized that no witness identified Curry as the person who shot Ward, and in fact the two eyewitnesses who knew Curry told law enforcement that he was not the shooter. Defense counsel did not mention the forensics evidence. He acknowledged that seven shots were fired from the Sig Sauer pistol that law enforcement located, but he questioned the circumstances surrounding the discovery of the pistol in plain sight the day after Curry was arrested. And he also noted the many other shots that were fired. Defense counsel did not mention the 911 call or the Y Gang photographs.

The jury found Curry guilty of first degree murder with a firearm enhancement and unlawful possession of a firearm.

Curry appealed his convictions. *State v. Curry*, No. 49026-9-II, slip op. at 1 (Wash. Ct. App. Apr. 24, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2049026-9-II%20Unpublished%20Opinion.pdf. Curry raised various issues on direct appeal. *Id*. at 1. This court affirmed Curry's convictions. *Id.*

Curry then filed this PRP.

## ANALYSIS

### A.   PRP PRINCIPLES

We will grant appropriate relief when petitioners establish that they are under restraint that is unlawful for one of certain specified reasons. RAP 16.4(a), (c). To prevail in a PRP, a petitioner must establish (1) "a constitutional error that resulted in actual and substantial prejudice," or (2) "a nonconstitutional error involving a fundamental defect that inherently

resulted in a complete miscarriage of justice." *In re Pers. Restraint of Dove*, 196 Wn. App. 148, 154, 381 P.3d 1280 (2016). The petitioner must make this showing by a preponderance of the evidence. *Id.* The standard for nonconstitutional error is stricter that the actual prejudice standard for constitutional error. *See In re Pers. Restraint of Amos*, 1 Wn. App. 2d 578, 589, 406 P.3d 707 (2017).

However, "a PRP is not a substitute for a direct appeal, and the availability of collateral relief is limited." *Dove*, 196 Wn. App. at 153. " 'Relief by way of a collateral challenge to a conviction is extraordinary, and the petitioner must meet a high standard before this court will disturb an otherwise settled judgment.' " *Id.* (quoting *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011)).

RAP 16.7(a)(2) requires a petitioner to specifically identify the evidence available to support the factual allegations in the PRP. *In re Pers. Restraint of Wolf*, 196 Wn. App. 496, 503, 384 P.3d 591 (2016). The petitioner must show that he has competent, admissible evidence to support the petition. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013). Conclusory allegations are insufficient. *Wolf*, 196 Wn. App. at 503. In addition, the factual allegations must be based on more than speculation and conjecture. *Yates*, 177 Wn.2d at 18.

B.     INEFFECTIVE ASSISTANCE OF COUNSEL

Curry argues that he was actually and substantially prejudiced by ineffective assistance of counsel because of defense counsel's failure to (1) challenge the testimony of the State's firearms ballistics expert, (2) move for a mistrial after the jury heard Karin's inadmissible hearsay testimony, (3) object to admission of a recording of Karin's 911 call on confrontation grounds; (4) request a limiting instruction regarding the 911 call recording, and (5) request a

limiting instruction regarding the photographs showing "Y Gang" evidence. We conclude that none of Curry's ineffective assistance of counsel claims have merit.

1. Legal Principles

Ineffective assistance of counsel claims arise from the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *Id*. at 457-58. Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id*. at 458. Prejudice exists if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have differed. *Id*.

We apply a strong presumption that defense counsel's performance was reasonable. *Id*. Defense counsel's conduct is not deficient if it was based on legitimate trial strategy or tactics. *Id*. To rebut the strong presumption that counsel's performance was effective, "the defendant bears the burden of establishing the absence of any '*conceivable* legitimate tactic explaining counsel's performance.' " *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

The "reasonable probability" standard for prejudice in an ineffective assistance of counsel claim on direct appeal is not precisely the same as the "actual and substantial prejudice" standard in a PRP. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 842, 280 P.3d 1102 (2012). However, a petitioner who presents a successful ineffective assistance of counsel claim necessarily establishes actual and substantial prejudice for purposes of collateral relief. *Id*. at 846-47.

2.    Failure to Challenge the Testimony of the Firearms Ballistics Expert

Curry argues that defense counsel rendered ineffective assistance by failing to challenge Walsh's firearms ballistics testimony.  Specifically, Curry asserts that defense counsel should have (1) objected to Walsh's testimony under ER 702 and *Frye*[2] because her analysis of bullet markings is not generally accepted in the scientific community, and (2) cross-examined Walsh regarding the inherent uncertainty of her analysis.  We disagree.

a.    Failure to Object Under ER 702 and *Frye*

"Decisions on whether and when to object to trial testimony are classic examples of trial tactics.  Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal."  *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (citations omitted), *review denied*, 193 Wn.2d 1038 (2019).  Reversal is required only if defense counsel had no valid strategic reason for failing to object, an objection likely would have succeeded, and the result of the trial would have been different if the evidence had not been admitted.  *Id.* at 508-09.

To be admissible, expert testimony must satisfy ER 702 and the *Frye* test.  *State v. Arndt*, 194 Wn.2d 784, 798, 453 P.3d 696 (2019).  ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  Expert testimony generally should be admitted under ER 702 if it assists the jury in explaining matters

---

[2] *Frye v. United States,* 293 F. 1013 (D.C. Cir.1923).

beyond the understanding of ordinary lay persons. *State v. Green*, 182 Wn. App. 133, 146, 328 P.3d 988 (2014).

The *Frye* test helps determine the admissibility of expert testimony based on a novel scientific theory. *Id.* at 148. Expert testimony is admissible under *Frye* if "the theory and underlying methodology have been accepted in the relevant scientific community." *Id.* at 149. There must be scientific consensus regarding the reliability of the methodology. *Arndt*, 194 Wn.2d at 798.

Significantly, "the *Frye* test focuses on general scientific theories, not particular opinions based on those theories." *Green*, 182 Wn. App. at 149. *Frye* is not implicated if an expert's opinions are based on generally accepted theories, even if those opinions themselves are not generally accepted. *Id.* "[T]he application of accepted techniques to reach novel conclusions does not raise *Frye* concerns." *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 919, 296 P.3d 860 (2013). And disputes over whether an acceptable technique was correctly performed in a particular situation go to the weight, not the admissibility, of the testimony. *State v. Bander*, 150 Wn. App. 690, 699, 208 P.3d 1242 (2009).

To demonstrate that Walsh's analysis is not generally accepted within the relevant scientific community, Curry relies principally on 2008 and 2009 reports from the National Research Council of the National Academy of Sciences as well as the 2016 President's Council of Advisor's on Science and Technology's report. These reports emphasized that firearm identification based on bullet markings depends on the subjective assessment of the examiner and not on any objective standards.

However, in *State v. DeJesus*, 7 Wn. App. 2d 849, 436 P.3d 834, *review denied*, 193 Wn.2d 1024 (2019), Division One of this court rejected a similar argument. In *DeJesus*, the

State presented expert testimony concluding that two sets of cartridge casings had consistent markings, indicating that they were fired from the same gun. *Id*. at 858. On appeal, the defendant argued the ballistics identification testimony was inadmissible under *Frye*. *Id*. at 859. The defendant cited the same three reports on which Curry relies. *Id*. at 861.

The court concluded that the trial court did not err in admitting the expert's testimony under *Frye* and ER 702. *Id.* at 865. The court stated, "[T]he reports on which DeJesus relies do not affect the general scientific acceptance of ballistic identification. Instead, the problems they espouse bear on the question of reliability of the individual test and tester at issue. These questions are then considered by the trier of fact in assessing the weight to be given to the evidence." *Id.* at 863-64. We agree with *DeJesus*.

In addition, Curry's primary concern appears to be that Walsh stated her opinions with certainty and without equivocation rather than acknowledging that her markings analysis was not an exact science. But Walsh's specific opinions regarding the reliability of her analysis do not implicate *Frye*. *See Green*, 182 Wn. App. at 149.

Finally, the record is insufficient for this court to determine whether a *Frye* objection would have been successful in the trial court. Because no objection was made, the State had no opportunity to present evidence showing that Walsh's analysis was generally accepted in the relevant scientific community.

We conclude that Curry cannot establish that the trial court would have excluded Walsh's testimony if he had objected.

b.    Failure to Cross-Examine

Curry argues that even if Walsh's testimony was admissible, defense counsel should have vigorously cross-examined her regarding the limitations of her analysis. The State contends that

defense counsel made a tactical decision not to attack Walsh's testimony but to instead focus on the absence of any link between the murder weapon and Curry.

Defense counsel certainly could have cross-examined Walsh about the subjectivity of her analysis, using the reports that Curry cites. And it is possible that counsel's failure to cross-examine was based on his ignorance of these reports or the legitimate questions about the markings analysis. But the issue is not whether defense counsel could have cross-examined Walsh. The question is whether Curry has established "the absence of any '*conceivable* legitimate tactic explaining counsel's performance.' " *Grier*, 171 Wn.2d at 42 (quoting *Reichenbach*, 153 Wn.2d at 130).

Defense counsel may have decided that without an expert of his own, any attempt to challenge Walsh's opinions would not have been effective. And undertaking a vigorous cross-examination may have mislead the jury into believing that Curry was guilty if they agreed with Walsh that the Sig Sauer pistol was the murder weapon. Counsel reasonably may have believed that the better strategy was to point out on cross-examination of Walsh that there was no DNA or fingerprint evidence connecting Curry to the pistol.

We can only speculate regarding whether defense counsel's failure to cross-examine Walsh regarding her markings analysis was based on deficient performance or on a legitimate trial strategy. As a result, Curry cannot establish deficient performance based on this record. *See State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018).

We conclude that Curry cannot establish ineffective assistance of counsel based on his failure to object to Walsh's testimony or cross-examine Walsh regarding her markings analysis.

3. Failure to Move for a Mistrial Based on Hearsay Testimony

Curry argues that he received ineffective assistance of counsel when trial counsel failed to move for a mistrial after the jury heard inadmissible hearsay testimony from Karin regarding the basis for her 911 call. We disagree.

Here, Karin testified that she "had a call from . . . my grandson's mother, and she was saying that there was speculation that my son could possibly be involved." 8B RP at 579. Defense counsel objected to this obvious hearsay statement, and the trial court sustained the objection. But the jury already had heard the statement. Defense counsel did not move for a mistrial.

However, whether to move for a mistrial necessarily is a strategic decision. Defense counsel may not have wanted a mistrial for various reasons. Again, we can only speculate why counsel did not request a mistrial, which is not a sufficient basis for an ineffective assistance of counsel claim. *See Linville*, 191 Wn.2d at 525.

Further, in order to prevail on a claim that counsel's failure to request a mistrial constituted ineffective assistance of counsel, Curry must establish that his counsel's request for a mistrial would have been granted. *See State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012) (articulating the same standard for a motion to sever). " 'A mistrial should be granted only when the defendant has been so prejudiced that nothing short of a new trial can insure that defendant will be tried fairly.' " *State v. Gaines*, 194 Wn. App. 892, 897, 380 P.3d 540 (2016) (quoting *State v. Gilcrist*, 91 Wn.2d 603, 612, 590 P.2d 809 (1979)). The fact that the jury heard this hearsay statement was mitigated by the fact that the statement was brief, the trial court immediately sustained Curry's objection, and Karin expressly stated that she was told that

Curry's involvement in the murder was speculation. Therefore, Curry cannot show that the trial court would have granted a mistrial motion even if defense counsel had made one.

Accordingly, we conclude that Curry cannot establish ineffective assistance of counsel on this basis.

4. Failure to Object to the Admission of the 911 Call

Curry argues that he received ineffective assistance of counsel when trial counsel failed to object to the recording of Karin's 911 call on confrontation clause grounds. We disagree.

Defense counsel's failure to object to testimony constitutes ineffective assistance only if the trial court would have sustained the objection. *Crow*, 8 Wn. App. 2d at 508-09. Therefore, the question here is whether the trial court would have sustained a confrontation clause objection to the 911 call recording if defense counsel had made one.

The confrontation clause of the Sixth Amendment to the United States Constitution precludes the admission of a "testimonial" out-of-court statement if the declarant is unavailable and the defendant had no prior opportunity to cross-examine the declarant. *State v. Burke*, 196 Wn.2d 712, 725, 478 P.3d 1096 (2021). However, the confrontation clause is inapplicable to out-of-court statements when the declarant appears at trial for cross-examination. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

Karin's statements made during the 911 call arguably were testimonial because they identified Curry as a potential suspect in Ward's murder and were not made to meet an ongoing emergency. But because she testified at trial, the admission of Karin's 911 call did not violate Curry's rights under the confrontation clause.

Curry argues that the 911 call implicates the confrontation clause because the source of Karin's statement in the call was a third person – her grandson's mother. However, the 911 call

did not mention Karin's grandson's mother or any other third person. Instead, Karin stated that "*I* think there's a possibility that my son was involved." PRP App. Attach. D (emphasis added).

There is no indication that the trial court would have sustained a confrontation clause objection to the 911 call recording. Accordingly, we conclude that Curry cannot establish ineffective assistance of counsel on this basis.

5. Failure to Seek Limiting Instruction Regarding the 911 Call

Curry argues that trial counsel provided ineffective assistance because he failed to seek a limiting instruction as to Karin's 911 call. We disagree.

Whether to request a limiting instruction is a matter of trial tactics. *State v. Yarbrough*, 151 Wn. App. 66, 90, 210 P.3d 1029 (2009). Failure to propose the instruction could have been a legitimate trial tactic because had defense counsel proposed this instruction, he could have risked reemphasizing the evidence. *See id*. A petitioner must rebut the strong presumption of reasonable performance by demonstrating that counsel's tactical choice was unreasonable given the circumstances. *See Grier*, 171 Wn.2d at 34.

Here, Curry fails to rebut this presumption. Defense counsel may have made a reasonable tactical decision regarding a limiting instruction. During closing argument, counsel focused on the lack of eyewitness identification evidence and did not mention the 911 call. Therefore, it appears that counsel was intent on avoiding emphasis on the evidence. Accordingly, we conclude that Curry cannot establish ineffective assistance of counsel on this basis.

6. Failure to Seek a Limiting Instruction Regarding "Y Gang" Evidence

Curry argues that trial counsel provided ineffective assistance because he failed to request a limiting instruction as to the State's "Y Gang" evidence. We disagree.

14

Here, the trial court allowed the State to introduce into evidence two photographs from a video featuring Curry and showing the term "Y Gang." The trial court offered to give a limiting instruction, but defense counsel declined. He stated that he did "not want argument that [Curry's] part of a gang and it's a gang shooting." 16 RP at 1687. Counsel elaborated that giving the instruction would be tantamount to "saying don't consider the gang evidence, except for credibility." 16 RP at 1688. In other words, counsel articulated his reasons for his decision on the record.

Curry argues that defense counsel's reasons for rejecting the limiting instruction were unreasonable because the proposed limiting instruction did not mention gang evidence. But defense counsel clearly wanted to avoid emphasizing the Y Gang evidence and believed that giving a limiting instruction would create such an emphasis. Given the strong presumption of reasonableness, *Estes*, 188 Wn.2d at 458, we conclude that defense counsel's strategic decision did not constitute deficient performance. Accordingly, we conclude that Curry cannot establish ineffective assistance of counsel on this basis.

C.     ADMISSION OF RECORDING OF 911 CALL

Curry argues that the trial court erred by admitting the recording of Karin's 911 call into evidence because it constituted double hearsay and was unduly prejudicial, in violation of ER 801, ER 802, and ER 403. We disagree.

To prevail in a PRP regarding the admission of evidence, a petitioner must show that the error constitutes a fundamental defect resulting in a miscarriage of justice. *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 168, 288 P.3d 1140 (2012).

"Hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay evidence generally is not admissible unless it falls within a

15

recognized exception to the hearsay rule. ER 802; *State v. Alvarez-Abrego*, 154 Wn. App. 351, 366, 225 P.3d 396 (2010). Hearsay within hearsay is admissible if each level of hearsay is independently admissible. *See* ER 805. But a prior statement of a witnesses offered to impeach that witness is not hearsay. ER 801(d)(1).

Curry argues that the 911 call contained double hearsay because Karin was simply repeating what she heard from her grandson's mother. He claims that the evidence was clear that the basis of Karin's statements on the 911 call was what she had heard from that person. However, the statements that Karin made in the 911 call were entirely her own. As noted above, she did not mention her grandson's mother. Instead, she stated, "*I* think there's a possibility that my son was involved." PRP App, Attach. D (emphasis added). There was no double hearsay.

Karin's own statements on the 911 call potentially were hearsay because they were made out of court. But the 911 call recording was offered and admitted for the purpose of impeaching Karin's credibility after she denied making the call was because she thought that Curry was involved in Ward's murder. Curry argues that the State improperly created the need for impeachment by unnecessarily asking Karin about the motivation behind her call. But the State's question posed to Karin about the motivation behind her call was legitimate.

Curry also argues that the 911 call should have been excluded under ER 403. But any prejudice that might have resulted from admitting the 911 call was outweighed by the probative value it had to impeach Karin.

We hold that the trial court did not err in admitting the recording of Karin's 911 call.

D.      CUMULATIVE ERROR

Curry argues that cumulative error denied him a fair trial. Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new

trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Here, Curry has not demonstrated that any error denied him a fair trial. Therefore, we hold that the cumulative error doctrine is inapplicable.

E.       INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Curry argues that he received ineffective assistance of counsel because his appellate counsel failed to raise on appeal the issues raised in this PRP. As discussed above, we hold that none of Curry's PRP claims have merit. Therefore, we reject Curry's argument.

CONCLUSION

We deny Curry's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

CRUSER, J.

VELJACIC, J.