# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the<br>Personal Restraint Petition of:<br><br><br>JOSHUA B. BENSINGER,<br><br><br>Petitioner. | No.60540-6-II<br><br><br><br>UNPUBLISHED OPINION |

MAXA, J. – In this personal restraint petition (PRP), Joshua Bensinger challenges his conviction of second degree rape. He argues that (1) the trial court's application of the rape shield statute, RCW 9A.44.020(2), deprived him of his right to present a defense under the Sixth Amendment to the United States Constitution; and (2) his defense counsel provided ineffective assistance of counsel when she failed (a) to cross-examine the victim's prior statement that during the incident with Bensinger she experienced a flashback related to a prior strangulation assault by another person, and (b) to properly argue that the victim's statements to an officer were not admissible under the excited utterance exception to the hearsay rule.

We hold that (1) Bensinger's evidentiary claims either have no merit or he fails to establish actual and substantial prejudice, and (2) Bensinger's ineffective assistance of counsel claims fail. Accordingly, we deny Bensinger's PRP.

FACTS

*Background*

In June 2021, Bensinger and his girlfriend AM had been living together for about a month.  On June 25, Bensinger left for an out-of-town training course.  Bensinger returned early from the training on the evening of June 27.  He met up with AM at a bar.

AM argued with Bensinger and told him that she wanted to end their relationship.  AM went back to her apartment, and Bensinger arrived around 1:00 AM.  According to AM, Bensinger was intoxicated, and he repeatedly said that he wanted to kill himself.  He also told AM that he wanted to stay in a relationship with her, but she refused and tried not to engage with him.  When AM attempted to go to bed, she noticed that Bensinger had wrapped a belt around his neck.  Believing that Bensinger was trying to kill himself, AM said she was going to call the police.  However, Bensinger took her phone.

AM then told Bensinger to leave.  As Bensinger started leaving, AM threw some of his clothes out of the front door and accidentally broke his necklace when she grabbed his shirt collar in an attempt to get her phone back.  According to AM, Bensinger became increasingly aggressive.  He started throwing his clothes at her and shoving her, insisting that they were not breaking up and stating that he was not leaving.  He also told AM that if she left him, he would report her to Child Protective Services and her child would be taken away from her.

This upset AM, and she went onto the balcony with the intent of committing suicide.  She changed her mind because she was unsure that the fall would kill her, and she returned inside and took pills in a suicide attempt.  The pills made her drowsy, and she lay down on the bathroom floor.

According to AM, Bensinger then dragged her into the bedroom and raped her orally, vaginally, and anally. AM claimed that during the rape, Bensinger also hit her and attempted to strangle her. AM was unsure whether Bensinger ejaculated during the rape. After the rape, AM managed to escape the apartment. She ran to a neighbor's apartment, and the neighbor called 911.

*Investigation*

Vancouver Police Officer Justin Reiner responded to the 911 call. He spoke to AM, and she told him about the rape. AM did not mention that she had attempted to commit suicide.

AM then was transported to the hospital and examined by sexual assault nurse examiner (SANE) Jan Schrader. Schrader took swabs for DNA testing from AM's mouth, neck, vulvar perineal area, and anus.

The State charged Bensinger with second degree rape. Bensinger pleaded not guilty and later waived his right to a jury trial.

In a pretrial defense interview, a defense investigator asked AM about the PTSD she previously had mentioned in an interview. AM responded that her now ex-husband had attempted to strangle her and that this assault had caused her a lot of emotional distress. As a result of the PTSD, she started taking an anti-depressant and an anti-anxiety medication. None of this information was presented at trial.

*DNA Results and Rape Shield Motion in Limine*

The results from the DNA testing disclosed that no male DNA was found on the oral or anal swabs. The vulvar perineal swabs showed three DNA contributors: AM contributed 28 percent of the DNA material, Bensinger contributed 2 percent, and an unidentified male contributed the remaining 70 percent. Similarly, the neck swabs showed three DNA

contributors: AM contributed 82 percent of the DNA material, Bensinger contributed 4 percent, and an unidentified male contributed the remaining 14 percent.

Before trial, the State moved to exclude the evidence that another male's DNA was found on the vulvar and neck swabs and any other evidence of AM's sexual history. The State brought this motion under the rape shield law, RCW 9A.44.020(2). The State argued that it was trying to foreclose the argument that the rape shield statute was trying to prevent – that because AM had sex with another man in the past, she must have consented to sex with Bensinger. The State also emphasized that consent was not even at issue because Bensinger claimed that he had no sexual contact with AM.

Bensinger responded that the fact that another male contributed 70 percent of the DNA was critical to Bensinger's defense and important for the court's analysis. He asserted that the evidence also would impeach AM's claim that she had not had sex with anyone other than Bensinger. Bensinger did not argue that the DNA evidence would provide an explanation for the redness and soreness that the SANE nurse observed.

The State argued that the small percentage of DNA attributable to Bensinger was relevant, but that the DNA from the other male source was not relevant. But the State agreed that Bensinger could impeach AM's prior statement that she had not had sex with anyone else. The State indicated that he could do this by asking, "[I]sn't it true that you told investigators one thing and that the DNA results are another thing and that that in fact is not true." Rep. of Proc. (RP) at 137. But he could not impeach by introducing substantive evidence of the DNA of another person.

The trial court ruled that testimony that another person contributed DNA would not be allowed, but Bensinger could impeach AM in the manner described by the State.

4

*AM Testimony*

AM testified to the facts described above. AM also explained that she did not mention her suicide attempts to Reiner or to anyone at the hospital because she was embarrassed and she did not want to risk losing custody of her child.

On cross-examination, defense counsel asked AM if she had introduced Bensinger to a polyamorous group. The State objected, citing the trial court's pretrial ruling. The court sustained the objection. A short time later, defense counsel asked AM if she earlier had stated that she and Bensinger "were exclusive essentially the day [they] met." RP at 189. AM agreed.

When cross-examining AM about the sexual assault examination, defense counsel asked AM if she had any knowledge about the outcome of the DNA testing. AM responded that she was aware that Bensinger's DNA had been found. When defense counsel asked if she knew anything else, the State objected based on the pretrial ruling. The trial court sustained the objection.

Defense counsel next asked AM what other tests were performed when she was at the hospital. AM responded that the hospital did a pregnancy test and tested her for sexually transmitted diseases (STDs). When defense counsel asked what the results of those tests were, the State objected based on the pretrial ruling. The trial court sustained the objection.

Defense counsel then asked AM if the police or Schrader had asked her when she had last had sex with Bensinger. The State objected based on the pretrial ruing. The trial court sustained the objection.

*AM's Neighbor Testimony*

During the trial, AM's neighbor Tammy Chance testified for the State. She testified that AM arrived at her door at 3:00 AM and that AM appeared to be frightened and in distress.

Chance initially had AM wait on the patio while she called the police. But Chance pulled AM into her apartment when Bensinger appeared and AM seemed to panic.

Chance testified that she called 911 because AM told her that she had been sexually assaulted. While waiting for the police, AM appeared to be very frightened.

*Officer Reiner Testimony*

Reiner testified that when he responded to the 911 call, he talked to Chance and then interviewed AM. He stated that AM cried throughout the interview, that she appeared to be very distressed, and that she seemed afraid. She also complained that it hurt to sit down, so she stood for part of the interview.

Reiner then testified about AM's detailed description of what had led up to the sexual assault and the sexual assault. The only objection defense counsel made to this testimony occurred when Reiner attempted to testify about AM's statements relaying what Bensinger had said to her:

Q Okay. At some point did she, I'm sorry. Without talking about the conversation between [AM] and [Bensinger], what happened next?

A [Bensinger] then pulled down [AM's] sweatpants and began penetrating her anally and vaginally *while saying that this was punishment for –*

[DEFENSE COUNSEL]: Objection, Your Honor.

A -- cheating on him.

[DEFENSE COUNSEL]: Outside the scope and it's hearsay.

THE COURT: All right. Again, objection sustained with regards to the statements.

[PROSECUTOR]: Your Honor, I would ask to admit that statement. It's not hearsay. *It's a statement by a party opponent.* And then the other level of hearsay is that *it's the victim's, an excited utterance to the officer.* The party opponent made the statement to [AM], [AM] excited utterance, made the statement to the officer.

THE COURT: All right. Objection overruled.

RP at 229-30 (emphasis added).

Reiner also testified that he had observed that AM had red marks on her neck that appeared consistent with someone having had their fingers wrapped around the side of her neck. Reiner's photographs of the marks or possible bruising on AM's neck were admitted. On cross-examination, Reiner identified another photograph of AM's neck, and he testified that at least some of the apparent bruising appeared to be older.

Reiner also testified on cross-examination that AM had told him that Bensinger had placed both hands around her neck and squeezed her neck for three seconds and that she had seen stars.

*Sexual Examination Nurse Testimony*

Schrader testified that during her examination, AM stated that Bensinger had strangled or choked her and that he had raped her orally, anally, and vaginally. While Schrader was taking AM's history, AM was crying and grimacing. AM also reported tenderness and pain when Schrader touched certain spots. AM said that a condom was not used and that she did not know if Bensinger had ejaculated.

During the physical exam, Schrader observed that AM had redness in her anal area and that AM reported tenderness when Schrader touched AM's external genitalia and anal area. Schrader took swabs for DNA testing from AM's mouth, neck, vulvar perineal area, and anus. While Schrader was packaging the evidence, she dropped the anal swabs on the floor.

On cross-examination, defense counsel asked if Schrader had observed any injuries to AM's neck. Schrader responded that she had noted in her report that there was tenderness and swelling on AM's neck, but Schrader qualified this statement by stating that this injury was probably reported by AM rather than observed.

Schrader also testified, over the State's relevancy and rape shield objections, that AM was given a pregnancy test during the exam and that AM was pregnant. Schrader further testified that AM had stated that her last consensual sexual contact was on June 22 (five days before the incident). Schrader stated that DNA evidence following sexual contact can exist for up to five days.

Neither counsel questioned Schrader about AM's references to PTSD or the prior strangulation attempt by her ex-husband.

*Examination Report*

Schrader prepared a report of her sexual assault examination, which was used to refresh her memory but not admitted as evidence. The report stated that AM had disclosed that she had recently been assaulted by her then-estranged husband and that Bensinger's choking her caused her to have flashbacks to when her ex-husband strangled her and she thought she was going to die. The report also noted that AM had stated that she was anxious and that she had PTSD. None of the information about the prior strangulation incident or AM's PTSD was presented at trial.

Schrader's report further stated that AM said that the last time she had had consensual sexual contact was on June 22, when she had oral and vaginal sex with Bensinger.

*Limiting Instruction*

Before presenting testimony from forensic DNA scientist Laura Dolezal, the State asked the trial court for an additional ruling on the DNA evidence. The State advised the court that it was seeking guidance on how to approach Dolezal's testimony, which would include the number of DNA contributors, in light of the court's pretrial ruling.

Despite the fact this was a bench trial, trial court adopted the following "limiting Instruction": "[C]ertain evidence has been admitted in this case for only a limited purpose. This evidence consists of the DNA results for the unknown individual and may be considered by you only for the purpose of evaluating the weight to give to the DNA evidence. You may not consider it for any other purpose." RP at 456. This instruction did not preclude the consideration of the absence of or low percentage of Bensinger's DNA on any of the swabs.

Recognizing that this was a bench trial, the trial court commented that it would not consider the DNA results for the unknown individual other than for the purpose of evaluating what weight to give the DNA results.

*State's DNA Expert Testimony*

Dolezal testified that the DNA profile from the sperm fraction of the vulvar perineal swabs and the DNA from the neck swabs was a mixture that included DNA from AM, Bensinger, and another contributor. She stated that the likelihood that the DNA on the vulvar perineal swabs originated from AM, Bensinger, and one unknown male was 160,000 times more likely than if the DNA originated from AM and two unrelated, random individuals. Dolezal stated that this gave strong support for the inclusion of Bensinger as a contributor.

Dolezal also testified that the likelihood that the DNA on the neck swabs originated from AM, Bensinger, and one unknown male was 18 times more likely than if the DNA originated from AM and two unrelated, random individuals. She concluded that AM was assumed as one of the contributors and that there was limited support for the inclusion of Bensinger as a possible contributor.

Dolezal stated that the amount of DNA available to test can impact the findings. She also confirmed that no male DNA was found on the anal or oral swabs. But she testified that dropping anal swabs on the floor could have contaminated those samples.

On cross-examination, Bensinger asked Dolezal for an opinion about how DNA can get on an object or person. Dolezal responded that many factors, including the passage of time between the time the DNA was deposited and when it was collected, could affect the amount of DNA present in a sample.

Dolezal stated that the DNA testing could estimate the percentages of DNA contributed by each contributor and that these percentages should add up to 100 percent of the DNA profile. The State objected, asserting that unless the trial court found this testimony to be within the scope of the limiting instruction, it was objecting based on the court's original pretrial ruling. The court responded that although the subject fell under the limiting instruction, it was "still explorable." RP at 372. Dolezal then testified to that for the vulvar perineal swabs, AM contributed 28 percent of the DNA material, Bensinger contributed 2 percent, and an unidentified male contributed the remaining 70 percent.

Defense counsel then asked Dolezal if she would expect to find an assailant's DNA when analyzing a swab taken within two to three hours of an alleged sexual assault. Dolezal responded that many factors determined how much DNA could be collected following a sexual assault and that "there [was] no set expectation of how much DNA may or may not be detected." RP at 374. But how quickly the sample was collected could affect the amount of DNA collected because of the risk that DNA would be wiped off or cleaned off and because DNA can degrade over time. Generally, "a collection after three hours would have the potential to collect more

DNA than the same amount being collected three days later." RP at 375. However, Dolezal stated that she could not "determine how or when DNA was transferred on an item." RP at 381.

*Bensinger's DNA Expert Testimony*

Bensinger called forensic DNA consultant George Chan to testify about the DNA results. Chan confirmed that the DNA on the perineal swab included 2 percent of Bensinger's DNA, 70 percent of an unknown male's DNA, and 28 percent of AM's DNA.

Chan also testified that the low percentage of DNA material attributable to Bensinger "kind of conflict[ed]" with Bensinger having been the last person to have had sexual contact with AM. RP at 441. Chan stated that based on the scenario AM presented, Bensinger's DNA should have been around 70 percent, not 2 percent. But Chan also stated that there were other factors, such as whether DNA material had been wiped away or whether the swabs had been contaminated from falling to the ground that could affect the DNA collection.

Chan further testified that there was no male DNA found on the anal swabs, which would have been unusual if there had been unprotected sexual contact. Chan stated that if someone had strangled another person, he would expect to find DNA from the person's hands on the victim's neck. In addition, Chan testified that DNA testing cannot establish how the DNA material came to be at a certain place or how old the DNA material was.

*Szabo Testimony*

Bensinger proposed to call Samantha Szabo to testify about AM's relationship status for impeachment and credibility purposes. The State objected based on the rape shield law and hearsay.

Bensinger argued that the State and trial court were applying the rape shield law in an overbroad fashion, and that he did not intend to ask questions about AM's sexual activity or prior

history and that the testimony was intended to impeach AM's prior statements. The trial court ruled that Szabo could testify as to impeachment questions.

Szabo then testified that at the time of the incident, she, AM and Bensinger were all dating.

*Closing Arguments*

In its closing argument, the State argued that it had proven second degree rape beyond a reasonable doubt. The State's argument relied on AM's testimony, and the State argued that her demeanor at trial, her demeanor when telling others about the rape, and her consistent statements to others demonstrated her credibility. The State also relied on the video from Chance's doorbell camera, Reiner's testimony about the redness on AM's neck and the fact AM could barely sit down due to soreness, and Schrader's testimony regarding redness and tenderness around AM's anus and other parts of her body.

Regarding the DNA evidence, the State argued that this was not a stranger-rape case and that DNA was not necessary to prove who the assailant was because AM identified Bensinger as her assailant in court and to other witnesses. The State then argued that it was the trial court's role to weigh the DNA evidence. The State argued that Dolezal's testimony about the DNA evidence was the most credible and that she stated that given all of the possible variables the only thing the evidence could show was whether or not Bensinger's DNA was present. The State pointed out that several factors could have affected the DNA evidence, including that AM urinated before the swabs were taken, some of the DNA could have been wiped off by her clothing, or DNA in her mouth could have been affected by the saliva in her mouth.

In Bensinger's closing argument, defense counsel's core argument was that AM was not credible and that her statements were not corroborated by the evidence. Defense counsel

asserted that those who saw AM shortly after the incident did not see any visible injuries and that this was inconsistent with AM's statements. Defense counsel also stated that the photographs taken of AM did not show any marks that were contemporaneous with the incident.

Defense counsel also argued that the absence of or the low percentage of Bensinger's DNA on the swabs demonstrated that Bensinger had not had sexual intercourse with AM on the night of the alleged incident. Defense counsel directed the trial court to Chan's testimony stating that finding none of Bensinger's DNA on the anal swab was not consistent with the scenario that AM presented.

Defense counsel also argued that Szabo's testimony that she was in a relationship with AM and Bensinger contradicted AM's testimony that she and Bensinger were in an exclusive relationship and reflected on AM's credibility.

*Bench Trial Verdict*

The trial court found Bensinger guilty of second degree rape. The court entered written findings of fact and conclusions of law.

In the findings of fact, the trial court found that AM's testimony; her repetition of the same facts to Chance, Reiner, and Schrader; AM's grimacing during the exam; and AM's demeanor when speaking to these witnesses established beyond a reasonable doubt that Bensinger had had sexual intercourse with AM under forcible compulsion. In its both oral ruling and written findings of fact and conclusions of law, the court did not mention the DNA evidence.

*Appeal and PRP*

Bensinger appealed his conviction. *See State v. Bensinger*, No. 57297-4-II (Wash. Ct. App. Oct. 3, 2023) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2057297-4-

II%20Unpublished%20Opinion.pdf, *review denied*, 2 Wn.3d 1019 (2024). This court affirmed his conviction, and the appeal mandated in February 2024. *Id*. at 1.

Bensinger filed this timely PRP in July 2024.

ANALYSIS

A.    PRP PRINCIPLES

To prevail in a PRP, the petitioner must establish by a preponderance of the evidence (1) a constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 306, 422 P.3d 458 (2018). Establishing "actual and substantial prejudice" means more than merely showing the possibility of prejudice; the petitioner must establish that if the alleged error had not occurred, the outcome more likely than not would have been different. *In re Pers. Restraint of Meippen*, 193 Wn.2d 310, 315-16, 440 P.3d 978 (2019).

RAP 16.7(a)(2) requires a petitioner to specifically identify the evidence available to support the factual allegations in the PRP. *In re Pers. Restraint of Wolf*, 196 Wn. App. 496, 503, 384 P.3d 591 (2016). Conclusory allegations are insufficient. *Id.* Any factual allegations must be based on more than speculation and conjecture. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013). The petitioner must show that they have competent, admissible evidence to establish facts that would entitle them to relief. *Id*.

B.    RIGHT TO PRESENT A DEFENSE

Bensinger argues that the trial court's application of Washington's rape shield law in several instances deprived him of his Sixth Amendment right to present a defense. We disagree.

1.    Legal Principles

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant's right to present a defense.  *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022).  The Supreme Court has developed a two-step process when addressing evidentiary rulings and the right to present a defense.  *Id*. at 58.

First, we review the trial court's rulings for abuse of discretion.  *Id*.  "Trial courts determine whether evidence is relevant and admissible."  *Id.* at 59.

Second, if we conclude that the trial court did not err in excluding the evidence or that the error was not prejudicial, we consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense.  *Id.* at 58.  The exclusion of evidence does not violate the defendant's right to present a defense if the defendant is still able to present relevant evidence to support their central defense theory.  *State v. Arndt*, 194 Wn.2d 784, 812-13, 453 P.3d 696 (2019).

Significantly, because a defendant has "no constitutional right to present *irrelevant* evidence," the evidence presented must be at least minimally relevant to implicate the right to present a defense.  *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401.

In a direct appeal, if we determine that the court erred in excluding evidence, we then analyze whether the error was harmless.  *Jennings,* 199 Wn.2d at 59.  But because this is a PRP, we must examine whether Bensinger could establish that the exclusion of the evidence resulted in actual and substantial prejudice for a constitutional error or inherently resulted in a complete

miscarriage of justice for a nonconstitutional error. *Meredith*, 191 Wn.2d at 306; *see also In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013) ("If a constitutional error is subject to harmless error analysis on direct appeal, that same error alleged in a PRP must be shown to have caused actual and substantial prejudice in order for the petitioner to obtain relief.").

   2.   Rape Shield Statute

The rape shield statute, RCW 9A.44.020(2), states that evidence of a victim's past sexual behavior is inadmissible on the issue of credibility or to prove the victim's consent. RCW 9A.44.020(2). Past sexual behavior includes but is "not limited to the victim's marital behavior, divorce history; general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards." RCW 9A.44.020(2). The rape shield statute was enacted "to erase the misogynistic and antiquated notion that a woman's past sexual behavior somehow affected her credibility." *Jones*, 168 Wn.2d at 723. "The purpose of the rape shield statute is to prevent prejudice arising from promiscuity and by suggesting a 'logical nexus between chastity and veracity.'" *State v. Sheets*, 128 Wn. App. 149, 155, 115 P.3d 1004 (2005) (quoting *State v. Peterson*, 35 Wn. App. 481, 485, 667 P.2d 645 (1983)).

Even where evidence might be prohibited by the rape shield statute, the Sixth Amendment precludes the statute from being used to bar evidence of "extremely high probative value." *See Jones*, 168 Wn.2d at 723. Evidence that tends to establish the defendant's theory of the case or disproves the State's case is generally relevant and admissible despite the rape shield statute. *Sheets*, 128 Wn. App. at 156. In addition, evidence regarding the victim's past sexual history may be admissible to impeach the victim based on inconsistent statements. *State v. Bartch*, 28 Wn. App. 2d 564, 579-80, 537 P.3d 1091 (2023), *review denied*, 2 Wn.3d 1026

(2024). Conversely, there is no constitutional problem with barring irrelevant evidence under the rape shield statute. *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983).

We review for an abuse of discretion a trial court's decision to exclude evidence under the rape shield statute. *Bartch*, 28 Wn. App. 2d at 579. But whether the rape shield statute applies to particular evidence is a question of statutory interpretation. *Id.* We review issues of statutory interpretation de novo. *Id*.

3. Trial Court's Rape Shield Ruling

The State moved to exclude evidence that another male's DNA was found on AM's vulvar perineal swabs and neck swabs under the rape shield law, RCW 9A.44.020(2). The trial court granted this motion, but allowed Bensinger to impeach AM's statement that he was her only sexual partner using a general reference to the DNA evidence. In the subsequent "limiting Instruction," the court ruled that it would consider DNA results for the unknown individual only to evaluate the weight to give to the DNA evidence and not for any other purpose. RP at 456. Bensinger challenges these rulings.

The evidence the trial court excluded related to AM's sexual history. Therefore, RCW 9A.44.020(2) applies unless Bensinger can show that the evidence that tends to establish the defendant's theory of the case or disproves the State's case. *See Sheets*, 128 Wn. App. at 156.

Here, whether AM had intercourse with another man was relevant to impeach AM based on her statement that she and Bensinger were in an exclusive relationship. And the trial court allowed Bensinger to impeach AM using a general reference to the DNA evidence. This ruling reflected a correct application of the rape shield statute. *See Bartch*, 28 Wn. App. 2d at 579.

Otherwise, whether AM had intercourse with another man was irrelevant to the only issue at trial – whether Bensinger forcibly raped her. Even if AM had intercourse with another man

17

shortly before her incident with Bensinger, that fact does not make it less probable that Bensinger raped her.

In a single sentence in his brief, Benninger suggests that intercourse with another man was relevant because it explained the vaginal tenderness she reported to the SANE nurse. But as the State points out, Bensinger did not make this argument in the trial court. And there is no evidence in the record that consensual intercourse would cause the type of tenderness AM experienced. In addition, Bensinger presents no argument why this minimal relevance is sufficient to overcome application of the rape shield statute. This evidence certainly does not have "extremely high probative value" as in *Jones*, 168 Wn.2d at 723. We generally decline to consider an issue when the appellant fails to provide any meaningful argument on that issue. *See State v. Arredondo*, 188 Wn.2d 244, 262, 394 P.3d 348 (2017).

Therefore, we conclude that the trial court did not abuse its discretion in admitting the DNA evidence for a limited purpose. In addition, the trial court's ruling did not violate Bensinger's right to present a defense because evidence that AM had intercourse with another man was irrelevant to whether Bensinger raped her. A defendant has "no constitutional right to present *irrelevant* evidence." *Jones*, 168 Wn.2d at 720.

Accordingly, we hold that the trial court did not violate Bensinger's right to present a defense by admitting evidence that another male's DNA was found on AM's vulvar perineal swabs and neck swabs only for a limited purpose.

4. Specific Evidentiary Challenges

Bensinger also claims that the trial court's *application* of its rape shield ruling improperly prevented him from presenting the certain specific evidence: (1) that AM claimed to have had intercourse with only him and to be exclusive with him despite having intercourse with another

18

man, (2) asking AM when she last engaged in consensual intercourse with him, (3) the identity of the other male contributor to the DNA, (4) that AM belonged to a polyamorous group, (5) regarding AM's understanding of the DNA evidence, (6) asking AM about pregnancy and STD tests performed during the SANE exam, and (7) regarding AM's relationship with Szabo. We conclude that the trial court did not violate Bensinger's right to present a defense and/or he cannot show that excluding this evidence caused him actual and substantial prejudice.

a.    Evidence Impeaching AM's Claim of an Exclusive Relationship

Bensinger argues that the trial court prevented him from presenting evidence that AM claimed to have had intercourse with only him and that AM claimed to be exclusive with him when the DNA evidence showed that she engaged in intercourse with another man. But Bensinger did ask AM whether she had stated that she and Bensinger were exclusive, and she agreed. And the trial court ruled that Bensinger could impeach AM's prior statements in which she asserted that her relationship was exclusive by referring generally to the DNA evidence, as long as he did not refer to the specific DNA results. So the court did not prevent Bensinger from asking AM about her claims of exclusivity. Therefore, we conclude that the court did not violate Bensinger's right to present a defense regarding this evidence.

In any event, whether AM had intercourse with another man was irrelevant to the issue at trial – whether Bensinger forcibly raped her. Therefore, we conclude that Bensinger does not show that excluding some evidence that he and AM were not in an exclusive relationship and that AM had intercourse with another man caused actual and substantial prejudice.

b.    Last Consensual Sexual Contact with Bensinger

During cross-examination, defense counsel asked AM if the police or Schrader had asked her when she had last had intercourse with Bensinger. The State objected based on the trial

court's pretrial ruling.  The court sustained the objection.  Bensinger asserts that the court misapplied the rape shield law in making this ruling.

We conclude that the trial court erred in excluding this evidence.  The rape shield statute states that evidence of a victim's past sexual behavior is inadmissible on the issue of credibility or to prove the victim's consent.  RCW 9A.44.020(2).  But this evidence did not relate to credibility or consent.  It was relevant to explain the presence of Bensinger's DNA in AM's vulvar perineal swabs.  So the question is whether Bensinger can show that this error prejudiced him.

Bensinger did not make an offer of proof regarding AM's expected testimony, so we do not know how AM would have answered.  But we can presume that AM would have testified consistently with the information contained in Schrader's report, that AM said that the last time she had had consensual intercourse with Bensinger on June 22.[1]

The DNA evidence showed that Bensinger previously had some sexual contact with AM.  And Chan's testimony provided evidence that the low percentage of Bensinger's DNA was not consistent with him having had recent sexual contact with AM.  Schrader testified that AM had stated that her last consensual sexual contact was on June 22 (five days before the incident).  Schrader testified that DNA evidence following sexual contact can exist for up to five days.  Therefore, the evidence that was admitted suggests that AM last had consensual intercourse with

---

[1] If we did not make this presumption, we would decline to review this issue.  In general, to obtain appellate review of the exclusion of evidence, a party must have provided an offer of proof in the trial court.  *State v. Wang*, 5 Wn. App. 2d 12, 26, 424 P.3d 1251 (2018).  In a PRP, a petitioner may be able to provide additional evidence that can show what a witness's testimony would have been.  But Bensinger has not done so here, other than what is contained in Schrader's report.

Bensinger on June 22. As a result, AM's testimony about the specific date would have added very little extra support for Bensinger's argument.

Accordingly, we conclude that Bensinger does not show that the trial court's error caused him actual and substantial prejudice.

### c. Identity of Unknown Male DNA Contributor

Bensinger argues that the trial court's rape shield rulings improperly prevented him from presenting evidence of the identity of the unknown male DNA contributor. But the record does not contain and Bensinger does not present us in his PRP with any evidence of the unknown male's identity. Because Bensinger does not show that this evidence existed, he cannot establish that the trial court misapplied the rape shield statute. Therefore, we conclude that the court did not violate Bensinger's right to present a defense regarding this evidence.

In any event, the identity of the man with whom AM had intercourse was irrelevant to the issue at trial – whether Bensinger forcibly raped her. Therefore, we conclude that to the extent the trial court's ruling prevented Bensinger from presenting evidence regarding the identity of the man with whom AM had intercourse, he does not show that excluding evidence of the identity of the man caused actual and substantial prejudice.

### d. Evidence of Polyamorous Relationship

During cross-examination, defense counsel asked AM if she had introduced Bensinger to a polyamorous group. The State objected based on the trial court's pretrial rape shield ruling. The court sustained the objection. Bensinger argues that the trial court misapplied the rape shield statute when it precluded him from presenting this evidence.

Arguably, the trial court erred in excluding this evidence because it was relevant to impeach AM's statement that she and Bensinger had an exclusive relationship. However, Szabo

was allowed to testify that she, AM, and Bensinger were in a relationship together at the same time. So Bensinger was able to present some evidence of "polyamorous" activity to impeach AM's statement. Therefore, we conclude that the court did not violate Bensinger's right to present a defense regarding this evidence.

Otherwise, whether AM and Bensinger were in a polyamorous group was irrelevant to the issue at trial – whether Bensinger forcibly raped AM. Therefore, we conclude that Bensinger does not show that excluding this evidence caused actual and substantial prejudice.

e.    AM's Understanding of the DNA Evidence

While cross-examining AM about the sexual assault examination, defense counsel asked AM if she had any knowledge about the outcome of the DNA testing. AM responded, "That I did have [Bensinger's] DNA inside of me." RP at 211. When defense counsel then asked her if she knew anything else about the DNA, the State objected based on the pretrial ruling. The trial court sustained the objection. Bensinger argues that the trial court erred when it sustained this objection because its application of the rape shield statute was overbroad.

This questioning appears to have been intended to introduce the fact the DNA testing revealed other DNA contributors. But there is nothing in the record or provided by Bensinger in his PRP showing what else AM may have known about the DNA evidence. Therefore, we conclude that the court did not violate Bensinger's right to present a defense regarding this evidence. And without this information, we conclude that Bensinger does not show that excluding this evidence caused actual or substantial prejudice.

f.    Pregnancy and STD Tests

Defense counsel asked AM what tests in addition to the DNA tests were done at the hospital. AM responded that she was given pregnancy and STD tests. When defense counsel

asked her what the results of those tests were, the State objected, arguing that this question violated the trial court's rape shield rulings. The trial court sustained the objection. Bensinger presumably asked this question to impeach AM's claim that she and Bensinger were in an exclusive relationship. Bensinger argues that in making this ruling the court misapplied the rape shield statute.

However, Schrader testified that AM was given a pregnancy test during the sexual assault exam and that AM was pregnant. So Bensinger as allowed to present this evidence. We conclude that the trial court did not violate Bensinger's right to present a defense regarding this evidence. And AM's testimony on the subject would not have added anything. Therefore, we conclude that Bensinger does not show actual and substantial prejudice.

Regarding STDs, again Bensinger did not make an offer of proof, so we do not know how AM would have answered. The record does not contain and Bensinger does not present any evidence in his PRP establishing whether AM had any STDs or, if she did, who had transmitted these STDs or when. Therefore, we conclude that the trial court did not violate Bensinger's right to present a defense regarding this evidence. And without this information, we conclude that Bensinger does not establish that excluding this evidence caused actual or substantial prejudice.

C.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Bensinger argues that he received ineffective assistance of counsel when defense counsel (1) failed to ask about AM's earlier strangulation incident and her reported PTSD flashback, and (2) failed to properly object to Reiner's testimony about AM's statements to him. We disagree.

1.    Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of

23

counsel. *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). To prevail on an ineffective assistance of counsel claim, a petitioner must show both that defense counsel's performance was deficient and that the deficient performance was prejudicial. *Id*. at 247-48.

Defense counsel's representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id*. There is a strong presumption that counsel's performance was effective, and to rebut that presumption that counsel's performance was effective, a petitioner bears the burden of establishing the absence of any legitimate strategic or tactical reason explaining counsel's conduct. *Id*. at 248. Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have been different. *Id*.

A petitioner who successfully demonstrates prejudice in an ineffective assistance of counsel claim necessarily has shown actual and substantial prejudice sufficient to obtain collateral relief in a PRP. *State v. K.A.B.*, 14 Wn. App. 2d 677, 707-08, 475 P.3d 216 (2020).

2. Failure to Cross-Examine AM About the Earlier Strangulation Incident

Bensinger argues that defense counsel provided ineffective assistance of counsel when she failed to cross-examine AM about the earlier strangulation incident that prompted the PTSD flashback AM reported to Schrader. He contends that this evidence would have provided another explanation for AM's fearful demeanor when she arrived at her neighbor's apartment and that it could have suggested that AM was confused about the two incidents and established reasonable doubt. We disagree.

The extent of defense counsel's cross-examination is a matter of judgment and strategy, and we will not find ineffective assistance of counsel based on counsel's decisions during cross-examination if counsel's performance fell within the range of reasonable representation. *State v.*

*Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). Bensinger bears the burden of establishing that there was no legitimate strategic or tactical reason behind his attorney's choice. *Vazquez*, 198 Wn.2d at 248. A decision to refrain from introducing evidence inconsistent with the defense theory of the case involves strategic or tactical considerations. *In re Pers. Restraint of Howerton*, 109 Wn. App. 494, 508, 36 P.3d 565 (2001).

Here, defense counsel's decision not to introduce testimony about AM's prior strangulation can be characterized as legitimate trial strategy. Defense counsel's closing argument shows that the defense strategy was to argue that there was no credible evidence that any assault occurred. Presenting evidence that Bensinger actually did assault AM and that his assault triggered a PTSD flashback would undermine that theory. Therefore, it could have been reasonable for defense counsel to refrain from introducing evidence that was potentially inconsistent with the defense's theory of the case. Accordingly, we conclude that Bensinger cannot meet his burden to show deficient performance on this ground and this ineffective assistance of counsel claim fails.

> 3. Failure to Properly Object to Hearsay

Bensinger argues that defense counsel provided ineffective assistance of counsel by failing to properly object to Reiner's testimony about AM's statements to him. Defense counsel objected only when Reiner started talking about what AM told him about what Bensinger said to her during the rape. But Bensinger contends that defense counsel should have objected to Reiner's testimony on the basis that AM's statements to him were not excited utterances and therefore inadmissible hearsay. He claims that AM's intentional omission of the fact she had attempted suicide demonstrated that she had the opportunity to fabricate her account of the incident. We disagree.

25

a.   Legal Principles

Whether and when to object typically is a strategic or tactical decision.  *Vazquez*, 198 Wn.2d at 248.  And a person claiming ineffective assistance of counsel based on a failure to object must show that the objection likely would have been sustained.  *Id.*

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  ER 801(c).  Hearsay evidence generally is inadmissible unless it falls within a recognized exception to the hearsay rule.  ER 802; *State v. Alvarez-Abrego*, 154 Wn. App. 351, 366, 225 P.3d 396 (2010).

ER 803(a)(2) provides a hearsay exception for excited utterances – statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  This hearsay exception is based on the premise that statements made while a person is under the stress of an exciting event will be spontaneous rather than based on reflection or self-interest, and therefore are more likely to be true.  *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992).

For the excited utterance exception to apply, the declarant's statement must meet three requirements: "(1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition."  *State v. Ohlson*, 162 Wn.2d 1, 8, 168 P.3d 1273 (2007).  "Often, the key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment."  *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001).

b.    Analysis

The issue here is whether if defense counsel had objected on the ground that the excited utterance exception was inapplicable, the trial court would have excluded Reiner's testimony about AM's statements to him.

Bensinger argues that the second requirement, whether AM made her statements to Reiner while still under the stress of the event, was not met because AM's decision to omit information about her suicide attempts demonstrates that she had an opportunity to consciously reflect on the situation and to change or alter her statements to protect her own self-interest. Bensinger contends that the trial court would not have admitted Reiner's testimony about AM's statements if defense counsel had clarified the standards that applied under *State v. Brown*, 127 Wn.2d 749, 757-59, 903 P.2d 459 (1995), and *State v. Hochhalter*, 131 Wn. App. 506, 516, 128 P.3d 104 (2006).

In *Brown*, the victim fabricated part of her story because she feared the police would not believe her rape allegation if she told them that she was a sex worker and that she willingly went to the defendant's apartment. 127 Wn.2d at 758. The court held that the excited utterance exception was inapplicable because the declarant "had the opportunity to, and did in fact, decide to fabricate a portion of her story." *Id.* at 759.

In *Woods*, the Supreme Court held that the trial court did not abuse its discretion when it admitted evidence of the hearsay statements that a severely beaten victim made to her father even though the victim omitted the fact that she had been out drinking and wanted to buy drugs from the suspect. 143 Wn.2d at 600-01. In reaching this conclusion, the court distinguished *Brown*. *Id*. at 599-601.

27

The court in *Woods* stated, "The alleged victim in *Brown* affirmatively hatched a story to bolster her own credibility," whereas the victim in *Woods* "merely failed to relate information about certain events in the evening." *Id.* at 600. The court determined that *even assuming the victim consciously omitted information from her statements* to her father, "[t]he fact that [the victim] failed to provide details about the previous night, . . . especially after being brutalized in such an egregious manner, is not comparable to the fabrication of fanciful statements that we saw in *Brown*." *Id*. Because the victim in *Woods* did not fabricate a story and merely omitted certain information, the court held that the trial court did not abuse its discretion by admitting her statements to her father under the excited utterance exception. *Id*. at 600-01.

The facts here are similar to those in *Woods*. Just as the victim in *Woods* omitted facts, AM told Reiner about the fight with Bensinger and the rape, but she omitted the fact that she had twice attempted or contemplated suicide during the course of the evening. Also, as in *Woods*, the facts here are distinguishable from *Brown* because there was no evidence that AM fabricated any additional facts. And although there are facts suggesting that AM consciously omitted facts, the Supreme Court in *Woods* expressly stated that it presumed conscious omission of the facts when reaching its decision.

Under these circumstances, including the fact the evidence showed that there was only a brief time between the rape and AM's statements to Reiner and the evidence showing that she was still under the stress of a violent incident, we conclude that Bensinger has failed to show that the trial court would have excluded this hearsay testimony even if defense counsel had objected on the ground it was not an excited utterance or discussed *Brown*.

Bensinger argues that the trial court would have excluded AM's statements to Reiner if defense counsel had advised the court of the standards applied in *Hochhalter.* In *Hochhalter*,

DD, Johnson, and Hubbard were present when DD's former boyfriend fired a pistol at Johnson. 131 Wn. App. at 510. Before calling 911, DD and Johnson drove Hubbard to a friend's house because he had outstanding warrants and did not want to interact with law enforcement. *Id*. Approximately 25 or 45 minutes after the incident and after stopping to get something to drink, DD and Johnson made statements to an officer during which they appeared to be very excited. *Id*. However, they "purposefully" omitted any mention of Hubbard. *Id*. This court refused to apply the excited utterance exception because the declarants "reflected beforehand . . . [and] consciously and intentionally omitted part of what they had observed." *Id*. at 516.

We disagree that *Hochhalter* precludes the use of the excited utterance exception to the hearsay rule here. Initially, the facts in *Hochhalter* are different than those here. In *Hochhalter*, a significant period of time passed between the assault and the statements, during which the declarants drove another witness to his friend's house and stopped to get something to drink. There was time for reflection. Here, AM made the statements to Reiner shortly after her neighbor called 911.

In addition, in *Hochhalter* this court failed to acknowledge *Woods*, which had been issued several years earlier. In *Woods*, the Supreme Court expressly stated that the conscious omission of facts alone is not sufficient to preclude admission under the excited utterance exception to the hearsay rule. 143 Wn.2d at 600. The trial court was bound to follow *Woods*. *See State v. Winborne*, 4 Wn. App. 2d 147, 175, 420 P.3d 707 (2018) (appellate courts are bound to follow Supreme Court precedent). Accordingly, we conclude that Bensinger does not show that the trial court would have excluded AM's hearsay statements to Reiner if defense counsel had argued that the statements were inadmissible under *Hochhalter*.

Because Bensinger does not show that the trial court would have excluded AM's hearsay statements to Reiner if defense counsel had properly objected, he does not establish ineffective assistance of counsel on this basis.

CONCLUSION

We deny Bensinger's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, P.J.

We concur:

_____
LEE, J.

_____
CHE, J.